IN THE UNITED STATES DISTRICT COURT FILED
FOR THE NORTHERN MISSISSIPPI DISTRICT

MAY 1 6 2012

DAVID CREWS, CLERK
BY_____ Deputy

GLENN E. GROSE #93456                    PETITIONER

                         U.S.D.C. # 3.12CV046-M-S

WARDEN V. J.J. Streeter, Et. AL.        RESPONDENT(S)


MEMORANDUM OF LAW
IN SUPPORT OF
PETITIONER'S §2254 HABEAS CORPUS
PETITION


_____Glen Moore #93456_____
        PETITIONER / PRO SE

# TABLE OF CONTENTS

| | Page |
|---|---|
| Table of Contents | i |
| Table of Authorities | ii |
| Statement of Case | iii-iv |
| Statement of Facts | 1-2 |
| Argument | 3-36 |
| Conclusion | 36 |

Attached Exhibits:

#A Statement of Issues from Direct Appeal
#B Judgement From Miss. Court of Appeals
#C Order Denying Motion for Rehearing
#D Issues Argued in Writ of Certiorari
#E Order Granting Writ of Certiorari
#F Order Denying Writ of Certiorari
#G Separate Written Statements of Justices of Sup. Ct.

Statutes, Etc.:

MRE 801(c) / 801(d)(1)(B)
MRE 802
MRE 803 (25)
28 U.S.C. § 2254(a)
28 U.S.C. § 2254(d)
28 U.S.C. § 2254(e)(2)
Black's Law Dictionary 660 (7th Ed. 1999)
"We The People" Legal Primer (May 2004 Ed.)
U.S. Const. 6th Amend.
U.S. Const. 14th Amend.

# TABLE OF AUTHORITIES

Page

Brecht v. Abrahamson, 507 US, 619 (1993) ............... 2. 28. 29.31

Bullcoming v. New Mexico, 131 Sct. 2705; 180 L.Ed. 2d 610 (2011) ... 16.28

Crawford v. Washington, 541 U.S. 36 (2004) ---------- 3.4.6.7.15.18.

Davis v. Washington, 547 U.S. 813 (2006) ---- 1.6.7.13.

Delaware v. Arsdall, 475 U.S. 673 (1986) --------- 14.15

Frazier v. State, 907 So.2d 985 (P36)(Miss. Ct. App. 2005) --- 6

Garrison v. State, 726 So.2d 1144, 1148 (Miss.1998) --------17

Hathorne v. State, 759 So.2d 1127, 1132 (26)(Miss.1999) ----22

Hayes v. Anderson, 2007 U.S. Dist Lexis 32502 (N.D.Miss.May 2, 2007) ---24

Hobgood v. State, 926 So.2d 847 (2006) ------------12.26

Idaho v. Wright, 497 U.S.805 (1990) ----- 17.18.19.21

Jackson v. Virginia, 443 U.S. 307 (1979) ----------31

Jordan, 2010 WL 3547997, at *8 -----------7

Kotteakos v. U.S., 328 U.S. 750 (1946) -----------27.29.30

Lattimer v. State, 952 So.2d 206 (40)(Miss.Ct.App.2006) --------26

Lockhart v. Johnson, 104 F.3d 54, 57 (5th Cir. 1997) --------24

McDonald v. Johnson, 139 F.3d 1056, 1059 (5th Cir. 1998) ------34

Michigan v. Bryant, 131 S.Ct. 1143, 179 L.Ed. 2d 93 (2011) ----6.7.9.10.11

Miller v. Johnson, 200 F.3d 274, 281 (5th Cir. 2000) ------16

Moawood v. Anderson, 143 F.3d 942, 947-48 (5th Cir) ------16.35

Morris v. Cain, 186 F.3d 581 (5th Cir 2000) --------24

Murphy v. Johnson, 205 F.3d 809 (2000) ----------33. 36

Ohio v. Roberts, 448 U.S. 56 (1980) --------------15

Owens v. State, 666 So.2d 814, 816 (Miss.1995) --------23

Perrillo v. Johnson, 79 F.3d 441, 444 (5th Cir 1996) --------34

Tome v. U.S., 513 U.S. 150 (1995) ------------22.23.24

U.S. v. Jackson, 636 F.3d 687 (2011) -----------15

U.S. v. Socony-Vaccuum Oil Co., 310 U.S. 150 --------30.31

White v. State, 616 So. 2d 304 (Miss. 1993) ---------25

Williams v. State, 970 So. 2d 727 (2007) ----------5

Williams v. Taylor, 529 U.S 362 (2000) ----------16.18.
25.

# STATEMENT OF CASE

In the year of 2008, October, 14th, the petitioner, and co-defendants were tried in the Lafayette County, Mississippi, Circuit Court for 3 counts of Sexual Battery and Child Neglect, were the Hon. Judge Andrew K. Howorth was presiding. After a jury trial, petitioner and Co-defendants were found guilty and were Convicted, on the charges where they were each sentenced to Life for each charge of sexual battery and (10) ten years for the charge of child neglect to run consecutively. The petitioner and co-defendants were sentenced as habitual offenders. Aggrieved by the judgement, petitioner and co-defendants filed a direct appeal in the Miss. Court of Appeals, arguing the following grounds for relief; (see exhibit # A attached for grounds argued on direct appeal). On 9/14/2010, the Court of Appeals affirmed the trial court's judgement, holding that the verdicts were not contrary to the weight of the evidence, or rather, the overwhelming evidence, also the Court held that it would not disturb the jury's verdict because the issues were without merit; (see exhibit #B, p. 23). Petitioner filed for rehearing that was denied on May 27th 2011; (see exhibit #C). The Court held that the motion was not well taken. Petitioner moved to file for Writ of Certiorari in the Miss. Supreme Court, on the issues

Stemming from trial on direct appeal; (see exhibit #D attached). On 9/1/2011, the Miss. Supreme Court granted the Writs' for petitioner and co-defendants; (see exhibit #E), but on 2/16/2012, the Court denied relief on the Writs, holding that it found that there was no need for further review; (see exhibit #F). Eventhough two Miss. Supreme Court justices were infavor of the Writs being granted and gave a seperate statement, as to why the Writs should be granted; (see exhibit #G), the Writs still were dismissed. Petitioner now moves this Honorable Court to render him habeas corpus relief based on the record evidence of a sixth amendment Confrontation right violation, the given statement of the Supreme Court Justices supporting his Contention, and based on the insufficient evidence in his case.

IV.

# STATEMENT OF FACTS

At the outset, petitioner asserts that, this is arguably one of the most convoluted set of inconsistencies ever presented to a court of law, in any criminal fact pattern. The forensic interview, conducted in this case was improperly conducted by Ejeera Joiner, an employee for "Finding Words Mississippi" which is also known as Family Crisis Services. The organization frequently does interviews for the purpose of assisting prosecutors, which in Davis v. Washington, 547 U.S. 813 (2006) and MRE 801(c), such as in nature is hearsay testimonial evidence and is a violation of the sixth amendment Confrontation Clause. Petitioner was not given an opportunity to confront the accuser, which falls under Crawford v. Washington, 541 U.S. 36 (2004) also as a sixth amendment violation. The statements given by the alleged victim did not contain indicia of reliability where they fail to pass the test in MRE 803(25) on a number of factors based in the rule, which states also that corroborating evidence may not be used as indicia of reliability; Idaho v. Wright, 497 U.S. 805 (1990). Petitioner asserts that he should have, awarded in this case, an evidentiary hearing based on the facts that he never recieved any fact-finding hearing in either proceeding, and where the videotaped interview should have been excluded based on the alleged

(1.)

sixth amendment violation, and the state court's failure to resolve his claims in accords with precedent of the U.S. Supreme Court, and where the court unreasonably applied the "Crawford" and MRE 803(25) precept, to petitioner's issues and facts as constitutional law. This Hon. Court is obligated to review petitioner's habeas petition in the Context of Brecht v. Abrahamson, 507 U.S. 619 (1993) (quoting Kotteakos v. U.S., 328 U.S. 750 (1946), where the U.S. Supreme Court held that this is correct process to determine trial error and its effect on jury verdict, on Collateral review. The petitioner deserves plenary review of his claims where he showed actual prejudice resulting from the videotaped interview and from the bolstering testimony of Carnelia Fondren in the case. The 14th Amendment Right of Due Process, (due process of law), gives "all" persons the right to recieve guarantees and safegaurds of the law and judicial process. It includes such constitutional requirements as adequate notice, assistance of counsel, the rights to remain silent, to a speedy and public trial, to an impartial jury, and to confront and secure witnesses. See U.S. 14th Amend. and "We The People" Legal Primer, (May 2004, Ed.), (at pg. # 25). Petitioner should be granted habeas review in this case.

(2.)

①

## GROUND ONE

Whether the State Court's decision on the tender years exception claim involved an unreasonable application of federal law, and was decided contrarily to established Federal law of the Supreme Court, according to "Crawford v. Washington"

a.) Petitioner contends that the tender-years exception was not properly applied in his case simply where; (1) the alleged victim in the case was not availible to testify; (2) the victim's statements were not reliable, including those made during the forensic interview; and (3) the statements were testimonial in nature, violating their right to confrontation, under <u>Crawford v. Washington, 541 U.S. 36 (2004)</u>.

b.) Under <u>Mississippi Rule of Evidence, 803 (25)</u>, statements made by a child regarding sexual abuse may be admissible as an exception to the hearsay rule.

c.) The state court applied the standard of "Crawford" but held that the issue here was without merit; assuming that the petitioner's right of confrontation clause was not violated, the state court dismissed the issue

(3.)

d.) The Sixth Amendment to the United States Constitution provides that, "in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him."

e.) Accordingly, the U.S. Const. 6th Amend., and the precedents of Crawford v. Washington, 541 U.S. 36 (2004), the U.S. Supreme Court held, "The principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused."

f.) "Crawford" held that the confrontation clause prohibits the admission of out-of-court "testimonial" hearsay statements against a criminal defendant unless the declarant is unavailible, and the defendant had a prior opportunity for cross-examination; Id. at 68, 124 S.Ct at 1374.

g.) Therefore, presumably speaking, where testimonial evidence is at issue, the Sixth Amendment demands what common law required: unavailibility and a prior opportunity for cross-examination.

h.) First, it is indisputed in the case that (A.B.) the alleged victim's statements were hearsay where the victim gave out-of-court, taped statements, which lead to the defendant (petitioner) not being able to cross-examine her, where the

(4)

victim did not testify at trial. As a threshold matter, the court must first determine whether the evidence at issue qualified as "hearsay".

i.) <u>Under Rule 801(c) of the Miss. Rules of Evi.</u>, "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" (internal quotations omitted); hearsay is not admissible except as provided by law; (MRE 802).

j.) In petitioner's case, the prosecution played the video tape before the jury. The operative, substantial information on the video came from (AB), the alleged victim. The victim was certainly not testifying at a trial or a hearing at the time. The prosecution offered the video taped interview for purposes other than the truth of the matter asserted, that petitioner engaged in inappropriate conduct with (AB); this would make the purpose not among the record, accordingly, the court in <u>Williams v. State</u>, 970 So. 2d 727 (2007), concludes that such video taped statement is indeed hearsay; (<u>Id at *734</u>).

k.) Petitioner contends that now since the determination of "hearsay" has been made, the court must find the testimony or rather, statements, as testimonial.

l.) As a result, if found testimonial, "testimonial hearsay must be exposed to confrontation by way of cross-examination prior to reaching admissible status"; see Frazier v. State 907 So 2d 985 (P36) (Miss. Ct. App. 2005); (Id. at P39).

m.) Under the authority of Davis v. Washington, 547 U.S. 813/2006), the court held that "Statements are non-testimonial for purposes of the Confrontation Clause when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency; (at HN3).

In addition the court held, that, "they are testimonial when the circumstances" indicate objectively that there is no such ongoing emergency, and the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution; (Id.)

n.) Petitioner asserts that the formality of an interrogation is not dispositive of whether the primary purpose of the interrogation was to gather evidence for a criminal prosecution; see Bryant, 131 S.Ct. at 1160; "This issue rests on the identity of the interrogator, and the content and tenor of the interrogator's question; (Id. at 1162).

(6.)

o.) Ejeera Joiner, a trained forensic interviewer. Conducted the interview at Family Crisis Services. "**Forensic**" has been defined as "used or suitable to Courts of law. <u>Black's Law Dictionary</u> 660 (7th ed. 1999).

p.) This definition indicates that a "forensic interview" is geared toward gathering information for use in court.

q.) The Miss. Appeals Court **applied** the standard in <u>Crawford</u> <u>v. Washington, 541 U.S. 36 (2004)</u>, incorrectly applying the standard and, deciding the claim, different from the Supreme Court on the question of testimonial and reliability on the issue, the Miss. Appeals Court held, "the forensic interview was non-testimonial because the interview was: (a) administered in by a non-profit entity (Family Crisis Services); and (b) no law enforcement had been involved; citing (<u>**Jordan**</u>, 2010 **WL** 3547997, at *8).

r.) Eventhough the state did not argue whether the primary purpose of the interview was to meet an ongoing emergency, as in "<u>**Davis and Bryant**</u>," the lack of participation of law enforcement members does not end the inquiry.

s.) The pertinent question, here is whether, objectively considered, all relevant circumstances indicate that the primary purpose of the forensic interview was to "establish, or prove past events potentially relevant to later criminal prosecution; **See** <u>Davis v. Washington, 547 U.S. 813 (2006)</u>; (at <u>Lcd HN1</u>).

(7.)

t.) An objective evaluation of all the relevant circumstances indicates that the primary purposes of the forensic interview of (AB) the victim, was to establish, or prove, past events relevant to a criminal prosecution of the victim's alleged accusers, where: the forensic interview was conducted in a formal setting, using a protocol designed to elicit information about past occurences, (RATAC), and preserved on videotape.

In addition, the testimony of Rhiannon Shaw, a family-protection specialist with DHS, establishes clearly that Family Crisis Service acted as an agent of law enforcement, by conducting the interview in order to gather information on behalf of DHS, the police, and the D.A.'s office.

u.) Shaw witnessed the interview, and also testified that the purpose of the forensic interview was "so that (AB) doesn't have to be interviewed by me and then the same question is asked by police, and the same question is asked by the D.A.; so that we can all see it on the tape; and she won't have to be asked more than once."

v.) Here, again, Shaw's testimony plainly shows that Family Crisis Services acted, as an agent of law enforcement in conducting a fact-finding interview on behalf of the three above mentioned entities.

(8.)

w.) The court, in Davis; Supra., explained that statements are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution.

x.) In Michigan v. Bryant, 131 S.Ct. 1143, 179 L.Ed. 2d 93 (2011), the court articulated the rule:

When a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine (a) the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, (b) in light of the circumstances in which the interrogation occurs; (Id at 1162).

y.) It was factually determined that the primary purpose of the interrogation was to prove past events relevant to a criminal prosecution of petitioner simply where the alleged sexual acts happened, in time previous to the day of the interrogation; based on the statements and actions to the encounter, of parties involved, it is shown on record where first, family-protection specialist Rhiannon Shaw was contacted by the victim's grandmother the next day the victim allegedly told her great-grand mother (Martha Grose) about the alleged abuse.

(9.)

**Z.** The interview as shown, was conducted by Ejeera Joiner on November 3, 2005; Rhiannon Shaw witnessed the interview, supposedly, with another (FCS) employee through a two-way mirror; and Tomiko Mackley studied the video taped interview later.

**Z2.)** The circumstances which an encounter occurs, for example, at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards are clearly matters of objective fact, but, the statements and actions of the parties must be objectively evaluated.

**Z3.)** Presumably, the relevant inquiry is not subjective or actual purpose of the individuals involved in a particular encounter, but rather, the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and circumstances in which the encounter occured; (Michigan v. Bryant, Supra., at HN 9).

**Z4.)** Regarding this rule, statements given by both Mackley and Shaw indicates, that the purpose of Joiner's interview questioning was to elicit testimony from the victim to gather information for criminal prosecution of the petitioner and co-defendants; (See exhibit # A, pgs. 5+6; see also exhibit #B, pg. # 6 at top).

(10.)

25.) Another factor is the importance of informality in an encounter between victim and the interrogator. Formality is not the sole touchstone of the primary purpose of the inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to establish or prove past events, informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent.

26.) Considering the question of formality, the interview conducted by Joiner, was highly formal, however, the formality of an interrogation is not dispositive of whether the primary purpose of the interrogation was to gather evidence for criminal prosecution according to (Bryant, (131 S.Ct. at 1160).

27. An objective evaluation of all relevant circumstances would indeed show that the videotape interrogation of the victim's forensic interview were elicited "with an eye toward use at trial", which was intended for a substitute of trial testimony.

28.) Therefore, in establishing the statements as hearsay, petitioner now moves within this issue to prove, that the statements were not only testimonial but he, and co-defendants did not have a prior opportunity to cross-examine the victim, show a valid claim of a Sixth Amendment Constitutional Violation.

(11.)

29.) The Mississippi Supreme Court determined that "a statement is testimonial when it is given to police or individuals working in connection with the police for purposes of prosecuting the accused". See Hobgood v. State, 926 So. 2d 847; (2006), at 852 (¶ 12).

210.) The Miss. Court of Appeals, in applying "Crawford" and "Hobgood", held that the statements were not testimonial and did not violate the petitioner's and co-defendants constitutional sixth amendment right. (See exhibit #B, pg. #16).

211.) In contrast to this, using the same standards and authoritive precept, the Miss. Supreme Court, on Certiorari review, stated that the testimony of Rhiannon Shaw, family-protection specialists, established that Joiner acted as an agent of law enforcement by the conducting of the interview in order to gather information on behalf of DHS, the police, and the D.A.'s office; (See exhibit #G, pg. #14).

212.) The above exhibit was given by two Miss. Supreme Court Justices who agreed that petitioner's 6th Amend. Confrontation Clause right was violated because of the video taped statements, holding that petitioner's conviction should be over turned.

(12.)

Z13.) The confrontation clause applies only to testimonial hearsay, where for such purposes, "testimony" typically means a solemn declaration or affirmation made for the purpose of establishing or proving some fact; but, the confrontation clause's scope is not limited to testimonial statements of the most formal sort, such as sworn testimony in prior judicial proceedings or formal depositions under oath.

Z14.) Giving that, for example, a conversation which begins as an interrogation to determine the need for emergency assistance can evolve into testimonial states once that purpose has been achieved.

Z15.) Justices Scalia, Stevens, Kennedy, Souter, Ginsburg, joined by Breyer, Ch. J. Roberts, and Alito, held that criminal trial courts, under obligation, will recognize the point in which, for purposes of the confrontation clause of the Federal Constitution's Sixth Amendment, statements in response to interrogations become testimonial; and through "in limine" procedure, should redact or exclude the portions of any statement that have become testimonial, as such courts do, for example, with unduly prejudicial portions of otherwise admissible evidence; See Davis v. Washington, 547 U.S. 813 (2006); (at HN7).

(13.)

Z16.) Petitioner showed in his previous proceeding and motion that he recieved a substantial violation of his constitutional sixth amendment right where, he was prohibited from engaging in appropriate cross-examination to show bias, in a prototypical form, on the part of the alleged victim in the case. **See** <u>Van Arsdall, 475 U.S. 673 (1986)</u>.

In addition, proper and adequate cross-examination, if the opportunity had been given to petitioner, would have more than likely have exposed to the jury in this case, the facts from which jurors could appropriately draw inferences, relating to the reliability of the victim's statements; (<u>Delaware v. Arsdall; Supra.</u>).

Z17.) In "Crawford", the court was referring to reliability with respect to the veracity of the statements at issue. But the court in "Arsdall" evaluated reliability in a different context, considering not whether the evidence in question is truthful, but whether it is the category of evidence its proponent claims; **See** (<u>Delaware v. Arsdall; at ** 22</u>).

Z18.) The goal of the confrontation clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner, by testing in the cruciable

(14.)

of cross-examination; See, U.S. v. Jackson, 636 F. 3d 687; (2011); Ohio v. Roberts, 448 U.S. 56 (1980); and also see Delaware v. Van Arsdall, 475 U.S. 673 (1986).

219.) Thus, the clause reflects a judgement, not only about the desirability of reliable evidence, but about how reliable can best be determined; Crawford v. Washington, 541 U.S. 36 (2004); (at HN9).

220.) Establishing where the evidence was not in accordance with this rule, is where two character witnesses, Rhiannon Shaw, a family-protection specialist with the DHS, and Tomiko Mackey, an expert in forensic interviewing, both gave statements (testimonial) that the interview conducted by Family Crisis Service employee Ejeera Joiner, was improper and inadequate where, the statements of the victim were inconsistent at times; that Joiner asked several questions at once without giving the victim an opportunity to respond; Joiner questioned the alleged victim about the petitioner and co-defendants, several times, in groups instead of individually; and, where Joiner brought petitioner's name into the interview was wrong because it was suggestive; (See exhibits # B, at pg. # 5-6; and exhibit # B, at pg. # 4-6, pg. # 6 at top).

221.) As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against an accused at trial unless the

(15.)

accused has had a prior opportunity to confront that witness; <u>Bullcoming v. New Mexico, 131 S.Ct. 2705</u>; <u>180 L. Ed. 2d 610 (2011)</u>.

Z22.) Pertaining to the rule mentioned earlier in this issue, not only were the videotaped statements hearsay, but they were testimonial in nature, unreliable, and should not have been admitted into evidence.

Z23.) Petitioner's **6th** and **14th Amendment Constitutional rights** were substantially violated, where his Sixth amendment confrontation right, was violated by him not having opportunity to cross-examine the victim in this case; and his fourteenth amendment right was violated where, he was deprived of liberty due to the fact that he did not recieve equal protection of the laws upon which the review of constitutional violations and habeas review stands.

Z24.) Petitioner should recieve habeas review on this claim, with him obtaining relief on this issue, according to <u>28 U.S.C. § 2254(d)(1)</u> and (d)(2); see also <u>Williams v. Taylor, 529 U.S. 362 (2000)</u>.

Z25.) Also, according to <u>Miller v. Johnson, 200 F. 3d 274, 281 (5th Cir. 2000)</u>, petitioner has, proving by clear and convincing evidence, that the state court determined the facts of this claim unreasonbly, in light of the evidence. <u>28 U.S.C. § 2254(d)(2)</u>. **(16.)**

② <u>GROUND TWO</u>

The trial court erred by finding that the interview statements of (AB) contained sufficient indicia of reliability

a.) According to <u>Garrison v. State, 726 So. 2d 1144, 1148</u> <u>(Miss. 1998)</u>, the indicia of reliability must be shown from the totality of the circumstances that surround the making of the statement.

b.) Prior to trial, the court conducted a hearing to determine the unavailibility of (AB) and whether her forensic interview conducted by Ejeera Joiner had proper indicia of reliability.

c.) Where the error occured is where the trial judge ruled that the interview contained sufficient indicia of reliability; where, the testimony showed that petitioner's name was only elicited by leading questions of the forensic examiner.

d.) Corroborating evidence may not be used as indicia of reliability; <u>Idaho v. Wright, 497 U.S.</u> <u>805 (1990)</u>.

e.) The district court must apply the subdivisions of <u>2254 (d)(1) and (d)(2)</u> here, on this claim, to determine if the trial court or whether the state court examined, the factors under <u>MRE 803 (25)</u>, in determining the indicia of reliability factor.

(17.)

f.) The federal habeas corpus statute permits federal Courts to entertain a habeas petition on behalf of a state prisoner only on the ground that he is in custody in violation of the Constitution, or laws, or treaties, of the United States, see 28 U.S.C. § 2254 (a); the law of the statute simply directs that the court dispose of the matter as law and justice require.

g.) In a Constitutional magnitude, "statute" is defined as an act of legislature, adopted pursuant to its constitutional authority, by prescribed means and in certain form such that it becomes the law governing conduct within its scope. See "We The People" Legal Primer, (May 2004 Ed.).

h.) Petitioner therefore asserts that according to statutory law, 2254(d), the state court possible and highly likely rendered petitioner a constitutional violation of his sixth and Fourteenth amendment according to authorized law in MRE 803(25); the cited required factor inquiry in Idaho v. Wright, 497 U.S. 805 (1990); and the inquiry in Crawford v. Washington, 541 U.S. 36 (2004).

i.) Petitioner's claims deserves and merits habeas review once 2254(d)(1) and(d)(2) are properly applied; Williams v. Taylor, 529 U.S. 362 (2000).

(18.)

j.) Four of the factors in Idaho v. Wright, 497 U.S. 805 (1990), weigh heavily against determining, that the statements made by (AB) are reliable.

k.) First, the "timing of the declarations," (factor number 5), were made in an environment used to elicit statements for the purpose of prosecution. Ejeera Joiner and Tomiko Mackey worked for an organization called Finding "Words of Mississippi," (Family Crisis Services), their forensic interviews are performed to elicit testimony for the sole purpose of assisting the prosecution during trial. The website for this organization admits that the interviewers training was designed by the American Prosecutor's Research; see website at, (http://www.nscac.org/finding words/history.html)

l.) This takes their respective opinions, questioning, and testimony outside the light of being objective.

m.) Second, the "relationship between the child and the witness", (factor number 6), is highly questionable. At the time of the forensic interview, (AB) had no prior relationship with Ejeera Joiner, and certainly did not have any type of rapport with her to know how to deduce the truth from her. The forensic interview was a mere twenty-one (21) minutes. (Trial Tr. pp. 454-55).

(19.)

n.) Notably, Ejeera did not testify at trial, instead, others testified that Ejeera essentially did a good job, despite the fact that Rhiannon Shaw and Tomiko Mackey testified to the flaws in Joiner's interview; (See

o.) Third, the age and maturity of the child, (factor number 10), is a factor that severely diminishes the reliability of truthfulness in this case.

p.) (AB), was three years old at the time of the interview, every single person that Ejeera asked (AB) about during the interview had molested her according to (A.B.'s) statements, including her grandparents.

q.) To say that a three (3) year old has limited capacity and is impressionable is an understatement. The court must consider within rational sense, that had Ejeera asked (AB) if Big Bird, Santa Clause, or the Tooth Fairy were real, (AB) would have undoubtedly said "yes" to those questions as well; this causes serious doubt as to the reliability of her truthfulness.

r.) Fourth, and most important, whether suggestive techniques were used in eliciting the statements, (factor number 11), during the examination, Ejeera Joiner constantly used

(20.)

suggestive leading questions to elicit statements from (AB). Petitioner's name did not arise until Joiner began leading (AB) and asking her specific people's names and whether they had touched her, in an appropriate manner.

s.) The trial judge should not have found that the forensic interview in this case had any indicia of reliability. Thus, this is even more pronounced when taking the entire interview and reviewing it in a vacuum, which must be how it is assessed.

t.) Turning back to the controlling precedent, corroborating evidence is not to be used to determine reliability; (Idaho v. Wright, supra.)

u.) Here, the state court's decision is contrary to federal law, where it arrived at a decision or conclusion, opposite to that reached by the U.S. Supreme Court on the question of whether indicia of reliability existed in (AB's) statements.

v.) In addition, the state court unreasonably applied the relevant factors in "Idaho v. Wright" to the facts established regarding this issue.

w.) The writ of habeas corpus presented, plays a vital role in protecting petitioner's constitutional rights, and relief must be granted upon state court's wrongful adjudication of claims; (see 28 U.S.C. § 2254(d).

(21.)

③

# GROUND THREE

Whether Carnelia Fondren's testimony should have been excluded. Where they were not only hearsay, but bolstered the credibility of Krystal Jordan's testimony, which was error; violating petitioner's right to fair trial

a) Under Miss. Supreme Court law, the Court held that an accomplice's testimony that he or she had previously entered a guilty plea to the same charge that the defendant is being tried for is evidence of a prior consistent statement; Hathorne v. State, 759 So. 2d 1127, 1132 (26) (Miss. 1999).

b) When the defense cross-examined Krystal about her plea agreement, she became confused and had difficulty answering questions. In an effort to rehabilitate Krystal, the State called Krystal's attorney, Carnelia Fondren as a surprise witness to testify to prior consistent statements Krystal had made during plea negotiations; which Krystal had motive to fabricate this story against petitioner.

c) In Tome v. U.S., 513 U.S. 150 (1995), the Supreme Court held that a prior consistent statement is admissible under Rule 801(d)(1)(B) only if it was made prior to the time that the motivation or fabrication arose. This is because a statement made after a motive to fabricate arose is not relevant to rebut a claim of recent fabrication.

(22.)

d.) Krystal's admissions to criminal conduct occured in the course of her plea negotiations with the State, they were made after her motive to fabricate existed, and they were not relevant to rebut the charge of recent fabrication; Krystal's statements to Fondren were inadmissible under Rule 801(d)(1)(B), and their admission impermissably bolstered Krystal's testimony.

e.) Rule 801(d)(1)(B) provides, in relevant part:

A statement is not hearsay if, the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (B), consistent, with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

f.) Therefore, a prior consistent statement may not be admitted to refute all forms of impeachment or merely to bolster the witness's credibility, but only to rebut an alleged motive; See Owens v. State, 666 So. 2d 814, 816 (Miss. 1995).

g.) Here, the Miss. Court of Appeals' conclusion on this claim was opposite to that of the United States Supreme Court's conclusion on a similar question of law in Tome v. U.S., 513 U.S. 150 (1995).

(23.)

h.) Under §2254(d), subsection (d)(1) applies to questions of law; Morris v. Cain, 186 F.3d 581 (5th Cir. 2000). The second exception, subsection (d)(2) applies to questions of fact; Lockhart v. Johnson, 104 F.3d 54, 57 (5th Cir. 1997).

i.) Since petitioner's claims challenge both the application of law and the finding of fact, this Court must consider the exceptions of both subsections; See Hayes v. Anderson, 2007 U.S. Dist. Lexis 32502 (N.D. Miss. May 2, 2007); (at *4 and *5)

j.) Regarding the above issue, the timing of the motive to fabricate, in this case, is key to the determination of admissibility; see Tome, 513 U.S. at 116, 115 S.Ct. at 705.

k.) The timing of Krystal's motive to fabricate is discernible from Fondren's testimony. Fondren testified that when Krystal was charged, she had denied any knowledge of who had abused (A.B.), the alleged victim. Fondren, then communicated with the prosecutor about a possible plea deal, and the prosecutor responded that he needed Krystal's assistance.

l.) In addition, a year had passed with no plea offer, during which time Krystal had maintained her innocence.

(24.)

M.) Then a plea deal was negotiated in which Krystal admitted to criminal conduct. Fondren specifically testified that, at the time she requested a plea deal from the prosecutor, Krystal had not yet revealed any inculpatory information.

n.) Presumably, she testified that she then had asked the prosecutor what kind of deal he could offer, assuming Krystal inculpated the petitioner and co-defendants. Then, is when Krystal told Fondren that she assisted the petitioner and co-defendants in sexually assaulting A.B.

O.) Krystal's admissions to criminal conduct occured in the carse of her plea negotiations with the state, they were made after her motive to fabricate existed, and they were not relevant to rebut the charge of recent fabrication. Krystal's statements to Fondren were inadmissible under Rule 801(d)(1)(B).

P.) This Court must also, independently examine the habeas petition claims, according to Williams v. Taylor, 529 U.S. 362 (2000), to see if the state court of appeals, or the Miss. Supreme Court adhered to the Court's confrontation of the issue of admissibility in, White v. State, 616 So. 2d 304 (Miss. 1993).

(25.)

q.) By Krystal's statements to Fondren being inadmissible, both of the witnesses statements should have been excluded according to 801(d)(1)(B).

r.) Petitioner Grose deserves habeas review and relief on this ground as well; 28 U.S.C. § 2254(a).

s.) It is not admissible to allow one witness to bolster the credibility of another by testifying to her truthfulness; see Goodson v. State, 566 So. 2d 1142 (Miss. 1990), see also Hobgood v. State, 926 So. 2d 847 (Miss. 2006); (see Trial Tr. pp. 668-673)(emphasis supplied.

t.) In a child abuse case, a witness's opinion that the alleged victim was telling the truth is of dubious competency and therefore, is inadmissible; Lattimer v. State, 952 So. 2d 206 (40)(Miss. Ct. App. 2006).

u.) This Honorable Court must see that petitioner deserves habeas review at least, on this claim; 28 U.S.C. § 2254(a).

v.) Under due process, the right of all persons to recieve the gaurantees and safe guards of the law, which due process is what the 5th and 14th Amend. revolves around in criminal or civil law.

(26.)

④

# GROUND FOUR

Whether there was constitutional trial error that had a substantial and injurious effect on determining the jury's verdict

a.) The materiality of a variance of proof does not depend upon the degree of its logical perversity, but upon how far it throws confusion into a trial and makes it likely to miscarry; ("Kotteakos")

b.) If, when all said and done, a conviction is sure that an error did not influence a jury, or had but very slight effect, a verdict and a judgement should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress; see <u>Kotteakos v. U.S., 328 U.S. 750 (1946); at **H.N 7-10**).</u>

c.) Presenting his issues, petitioner showed in detailed indiction, the errors of the trial court and state in his case where it evolved around the presentation of the taped video statement of the alleged victim in the case, the testimony given of Krystal Jordan and her attorney, Carnelia Fondren, that bolstered the credibility of Jordan's testimony, and the indicia of reliability issue.

d.) Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless

(27.)

beyond a reasonable doubt. The State bears the burden of proving that an error passes muster under this standard; <u>Brecht v. Abrahamson</u>, <u>507 U.S. 619 (1993)</u>; (at HN5).

e.) The State failed to prove this requirement regarding each issue mentioned in this habeas petition, excluding the evidentiary hearing issue.

f.) The State possesses a primary responsibility (authority), for defining and enforcing the criminal law, in criminal trials they also hold the initial responsibility for vindicating constitutional rights; (Id. at HN11).

g.) Petitioner recieved a violation of his Sixth Amend. Right of Confrontation, which is clearly shown by the record. Two Miss. Supreme Court Justices explained in detail the points where the right was violated; (see Exhibit #6).

h.) By violating this right, the petitioner also recieved a **14th Amendment Right** violation, which occured where he was denied due process of law, abridging his priviledges to law, and equal protection; (14th Amend.).

i.) The test under "Kotteakos" is whether the errors complained of by the petitioner, had substantial and injurious effect or influence

(28.)

in determining the jury's verdict is the test the U.S. Supreme Court rendered to determine on collateral review. Under this standard, habeas petitioner's may obtain plenary review of their constitutional claims, and are entitled to habeas relief, based on trial error if they establish actual prejudice; (Brecht, at HN 14).

j.) If this Court can not say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgement was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected; See Kotteakos v. U.S., 328 U.S. 750 (1946); see also (28 U.S.C. § 391).

k.) The U.S. Supreme Court has stated that, "on the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the Court shall give judgement after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties; (Kotteakos; Supra., at HN 4).

l.) The character of the proceeding, what is at stake upon its outcome, and the relation of the error asserted to the casting balance

(29.)

for decision on the case as a whole, are material factors in judgement; (U.S. v. Socony-Vacuum Oil Co., 310 U.S. 150).

m.) Petitioner asserts that the character of the proceeding is a collateral proceeding that is designed to protect him from all Constitutional right violations; (28 U.S.C § 2254(a).

n.) What is at stake upon the outcome of this habeas proceeding is petitioner's liberty and equal protection of laws of this Court and State.

o.) And last of all, the error asserted to the Casting balance for decision by the Court on the petition, is quite clear; Petitioner recieved a substantial violation of his Sixth Amend. Right of Confrontation, and his Fourteenth Amend. Right of Due Process of Law; see (6th and 14th Amend. of U.S. Const.).

p.) In the final analysis judgement in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of stare decisis by what has been done in similar situations; See (Bollalos v. U.S., at HN 2).

q.) To weigh the error's affect against the entire setting of the record without relation to the verdict or judgement would be almost to work in a vacuum; (Cf. U.S. v. Socony-Vaccum Oil Co., supra., at 239, 242).

r.) In criminal causes that outcome is conviction. This is different, or may be, from guilt in fact. It is guilt in law, established by the judgement of laymen. And the question is, not were they right in their judgement, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting; (Cf. U.S. v. Socony-Vacuum Oil Co., supra, at 239, 242).

s.) As was said previously, habeas corpus is designed to gaurd against extreme malfunctions in state criminal justice systems; Justice Stevens, concurring judgement; Jackson v. Virginia, 443 U.S. 307 (1979).

t.) Trial error occurs during the presentation of the case to the jury, and is amenable to harmless-error analysis because it may be quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial. Brecht v. Abrahamson, 507 U.S. 619 (1993).

U.) At the other end of the spectrum of constitutional errors lie structural defects in the constitution of the trial mechanism, which defy analysis by "harmless error" standards; (Id.).

V.) The fact that petitioner was deprived of the Sixth Amendment confrontation priviledge to confront the accuser and statements, definately defied the harmless-error analysis; this would require a reversal of Grose's conviction because such an error infected the entire trial process.

W.) Petitioner's trial proceeding was based on the interviewed taped statements of the alleged victim (AB), the daughter of Krystal Jordan; the taped interview was found to be hearsay and abridged Grose's, 6th Amendment Right, not only by facts and constitutional law, but by two Justices of the Miss. Supreme Court; (see exhibit #G)

X.) Justice Stevens, concurring, "a reviewing Court, in order to apply the substantial-effect standard properly, was and is required, as the U.S. Supreme Court has done in this case, to make a de novo examination of the trial record; and given the critical importance of the faculty of judgement in administering either standard; the reasonable doubt standard

(32.)

or the harmless-error standard; (Brecht v. Abrahamson; supra.).

y.) Therefore, concluding this issue, the question is not whether the jury was right in its judgement, regardless of an error or it's effect upon the verdict. In this case concerning collateral review doctrine, it is rather, what effect the error had or reasonably may be taken to have had upon a jury's decision; (See Kotteakos v. U.S., 328 U.S. 750 (1946); see at HN 7,8, and 9).

---

(5.) <u>GROUND   FIVE</u>

Whether the petitioner should be awarded an evidentiary hearing to obtain substantial facts to support his claims

a.) A petitioner is entitled to an evidentiary hearing only where a factual dispute, if resolved in his favor, would entitle him to relief, and not where a petitioner's allegations are merely conclusory allegations unsupported by specifics; <u>Murphy v. Johnson, 205 F.3d 809 (2000)</u>; (at HN 4, 10, 12, and 15).

b.) Petitioner's allegations are not conclusive, and are indeed supported by the record where he showed a six and fourteenth amendment

(33.)

violation which, under the Sixth Amendment, he was deprived of his right and an opportunity to cross-examine the accuser in this case, who, gave hearsay taped statements against the accused petitioner.

In addition, petitioner again submits non-conclusory allegations where he showed that the substantial Sixth Amend. violation caused him to be abriged of priviledges and equal protection of law under the due process of laws of the Constitution and Statutes; see (6th and 14th Amend. of Const.).

C.) Petitioner has shown the requisite where, he has not failed to develop the factual basis for his claim in either this Court or State Court, based on the record facts and issues in this petition.

d.) Even though under AEDPA, requests for an evidentiary hearing are to be evaluated under the provisions of 28 U.S.C. § 2254 (e)(2), See McDonald v. Johnson, 139 F.3d 1056, 1059 (5th Cir. 1998), the Court should not forget that prior to AEDPA, it consistently was held that when there is a factual dispute which if resolved in the petitioner's favor, would entitled him to relief and the state has not afforded him a full and fair hearing, a federal habeas corpus petitioner is entitled to discovery and an evidentiary hearing; Perrillo v. Johnson, 79 F.3d 441, 444

(34.)

(5th Cir. 1996) (quoting Ward v. Whitley, 21 F.3d 1355, 1367 (5th Cir. 1994); see also Moawad v. Anderson, 143 F.3d 942, 947-48 (5th Cir.).

e.) To find an abuse of discretion that would entitle Grose to, an evidentiary hearing, this Court must find, that the State "did" not provide him with a full and fair, hearing and, thus, must be convinced that if proven true, petitioner's allegations would entitle him to relief; see (Moawad, 143 F.3d at 948).

f.) Petitioner deserves to be awarded an evidentiary hearing to iron out the facts concerning the interview, that was conducted of the alleged victim in the case. The interrogater in the interview, Ejeera Joiner, was not conducting a proper interview, according to Rhiannon Shaw, a DHS family protection specialist, and Tomiko Mackey, a licensed social worker; (see exhibits #B, pgs.#5-6; and exhibit#G, pgs. #6).

g.) This Court should construct an evidentiary fact-finding procedure in order to find if indeed the questions by Joiner prejudiced Grose's defense, and to see if the evidence presented on the subject of the interview was enough to show and prove that Grose recieved a Sixth and Fourteenth Amend. right violation.

(35,)

## CERTIFICATE OF SERVICE

This is to certify that I, the undersigned, have this day and date mailed, via United

States Mail, postage pre-paid, a true and correct copy of the foregoing and attached

instruments to the following:

U.S. Dist. Court    Jim Hood
Pro Se Law Clerk   Atty. Gen. of Miss.
Northern Dist. of Miss  P.O. Box 220
P.O. Box 704    Jackson, Ms. 39205
Aberdeen, Ms. 39730

X This the _____ day of _____, 20 _____.

*Allen Strose*
PETITIONER
MDOC#___ 93456 ___

MCCF / 833 West St.
Address

Holly Springs, Ms. 38635
Address

*Exhibit # A*

## STATEMENT OF THE ISSUES

I.    The Trial Court Erred By Allowing Into Evidence The Forensic Interview Of B.J. Because The Interview Did Not Have Sufficient Indicia Of Reliability And The Interview's Admission Violated *Crawford v. Washington*

II.    The Trial Court Erred By Not Allowing The Defense To Cross-Examine The State's Witness Gloria Beccerill About Her Pending Drug Charge In Pontotoc County, Violating His Sixth Amendment Rights To Cross Examination And Contrary To *Giglio* and *Napue* As Well As *Miss. R. Evid.* 616

III.    The Trial Court Erred When It Did Not Grant A Mistrial Regarding The Testimony Of Carnelia Fondren

IV.    The Trial Court Erred When It Allowed The State To Amend The Indictment To Add Substantive Changes And This Error Violated Mr. Grose's Sixth Amendment Rights

V.    There Was Insufficient Evidence To Convict Glen Grose And As Such His Case Should Be Reversed And Rendered, Additionally The Verdict Was Against The Overwhelming Weight Of The Evidence And The Trial Court Erred By Not Granting A New Trial

VI.    Conclusion

*Exhibit #B*

*1 of 2*

# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2008-KA-01761-COA

TIMOTHY W. JORDAN GLENN E. GROSE *# 93456*                    APPELLANTS
AND JOHNNY GROSE

v.

STATE OF MISSISSIPPI                                           APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/14/2008 |
| TRIAL JUDGE: | HON. ANDREW K. HOWORTH |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | GEORGE T. HOLMES |
| | LESLIE S. LEE |
| | HUNTER NOLAN AIKENS |
| | JOSHUA AARON TURNER |
| | ALAN TODD ALEXANDER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE MCCRORY |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | TIMOTHY W. JORDAN - CONVICTED OF FOUR COUNTS OF SEXUAL BATTERY AND SENTENCED TO LIFE FOR EACH COUNT, WITH THE LIFE SENTENCES TO RUN CONCURRENTLY; ONE COUNT OF GRATIFICATION OF LUST AND SENTENCED TO TEN YEARS; AND ONE COUNT OF CHILD NEGLECT AND SENTENCED TO TEN YEARS, WITH THE TWO TEN-YEAR SENTENCES TO RUN CONCURRENTLY WITH EACH OTHER BUT CONSECUTIVELY TO THE LIFE SENTENCES, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| | GLENN E. GROSE   CONVICTED OF THREE COUNTS OF SEXUAL BATTERY |

*APPENDIX A1*

*2a*

AND SENTENCED AS A HABITUAL
OFFENDER TO LIFE FOR EACH COUNT;
AND ONE COUNT OF CHILD NEGLECT
AND SENTENCED AS A HABITUAL
OFFENDER TO TEN YEARS, WITH THE
SENTENCES TO RUN CONSECUTIVELY
IN THE CUSTODY OF THE MISSISSIPPI
DEPARTMENT OF CORRECTIONS

JOHNNY GROSE - CONVICTED OF TWO
COUNTS OF SEXUAL BATTERY AND
SENTENCED TO LIFE FOR EACH COUNT,
WITH THE LIFE SENTENCES TO RUN
CONCURRENTLY; ONE COUNT OF
GRATIFICATION OF LUST AND
SENTENCED TO TEN YEARS; AND ONE
COUNT OF CHILD NEGLECT AND
SENTENCED TO TEN YEARS, WITH THE
TWO TEN-YEAR SENTENCES TO RUN
CONCURRENTLY WITH EACH OTHER
BUT CONSECUTIVELY TO THE LIFE
SENTENCES, ALL IN THE CUSTODY OF
THE MISSISSIPPI DEPARTMENT OF
CORRECTIONS

DISPOSITION:                           AFFIRMED: 09/14/2010
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE KING, C.J., GRIFFIS AND ISHEE, JJ.**

**KING, C.J., FOR THE COURT:**

¶1.     In 2006, Krystal Jordan, Timothy Jordan, Glenn Grose, and Johnny Grose were

indicted for sexual battery, gratification of lust, and child neglect of A.B., Krystal and Tim's

then three-year-old daughter.[1] Krystal pled guilty to three counts of sexual battery and felony

---

[1] To protect the identity of minor victims of sexual abuse, we substitute fictitious
initials for their names.



*APPENDIX A* 2

2

2a

child abuse. Because the trial court denied Tim's motion for a severance, the remaining

defendants underwent a joint trial where Krystal testified against them. All three men were

convicted of the charges. Aggrieved, Tim, Glenn, and Johnny appeal separately, raising

several issues for the Court's review.

For the sake of judicial efficiency, we have grouped their issues as follows:

I. Did the trial court err by denying Tim's motion for severance;

II. Did the trial court err by allowing the State to amend the dates contained
in the indictment, expanding the time in which the alleged offenses occurred;

III. Did the trial court err by allowing improper hearsay testimony, including
the forensic interview, to be admitted into evidence under the tender-years
exception;

IV. Did the trial court err by allowing the State to ask Krystal leading
questions;

V. By allowing Carnelia Fondren and Pammie Davidson to testify, did the
trial court erroneously allow improper legal opinions, comments on the
evidence, and bolstering of Krystal's veracity;

VI. Did the trial court err by not allowing the defense to cross-examine Gloria
Hollis Becerril regarding her pending drug charge; and

VII. Is the verdict against the overwhelming weight of the evidence?

Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    Numerous witnesses testified during this trial. Because the State bore the burden of

proving that the defendants committed the crimes charged beyond a reasonable doubt, we

will focus on the State's witnesses.

### I. The State's Case-In-Chief

*Appendix A3*

3

### a. Martha Hester Grose

¶3.    Martha Hester Grose is A.B.'s maternal great-grandmother. Martha testified that on October 30, 2005, she had received Tim's permission to keep A.B. for a few days. On the first night, A.B. complained of pain whenever she urinated and during her bath. Curious, Martha looked and saw that A.B.'s legs and inner thighs were red. Martha asked A.B. if anyone had "hurt her down there," and A.B. replied yes. Martha testified that A.B. named Tim, Krystal, Johnny, and Glenn as the perpetrators. Martha did not report the alleged abuse that night.

### b. Gloria Hollis Becerril

¶4.    The next morning, Martha took A.B. to Gloria Hollis Becerril, who is A.B.'s maternal grandmother, and relayed A.B.'s allegations to Gloria. Gloria checked the child's genitalia and saw that it was red and "raw." Gloria questioned A.B. about the alleged abuse; and again, A.B. named Krystal, Tim, Glenn, and Johnny as the perpetrators. Gloria testified that A.B. specifically told her that Tim had sexually assaulted her in the shower. Afterwards, Gloria called the Department of Human Services (DHS) to report the alleged abuse.

¶5.    Gloria also testified regarding A.B.'s behavior following the allegations of sexual abuse. A.B. would masturbate, grab peoples' private parts, express a desire to touch someone or to have someone touch her, abuse the family dog, physically assault and fondle her baby sister, and simulate oral sex with food.

¶6.    On cross-examination, Gloria testified that she was afraid that A.B. would accuse her of sexual abuse. The defense elicited from Gloria that she once had a sexual relationship with Glenn and also questioned Gloria about her pending drug charge.

*Appendix A4*

4

### c. Rhiannon Shaw

¶7.    Before this incident, DHS had received a few anonymous calls regarding Krystal's

drug abuse, alleged prostitution, and possible child neglect. On October 31, 2005, Rhiannon

Shaw, a DHS family protection specialist,  received a phone call from Gloria.  Gloria

reported that A.B.'s bottom was "raw" and that A.B. had disclosed that Krystal, Tim, Glenn,

and Johnny had touched her inappropriately.  Shaw instructed Gloria not to question A.B.

anymore, and she immediately scheduled a forensic interview and medical examination of

A.B.

¶8.    Via a two-way mirror, Shaw observed the forensic interview, which was conducted

on November 3, 2005, by Ejeera Joiner of Family Crisis Services.  The jury viewed the

forensic interview.  Afterwards, Shaw was questioned about the interview.  Shaw testified

that A.B. stated that Krystal, Tim, Glenn, and Johnny had touched her "nu-nu."  A.B. also

said that Tim, Glenn, and Johnny touched her "nu-nu" with their penises, and A.B.

demonstrated the acts using anatomically correct dolls.

¶9.    During cross-examination, Shaw testified that A.B.'s statements were inconsistent at

times, and Joiner did lead A.B. on some questions. **For instance, A.B. did not name Glenn**

**as a perpetrator until Joiner asked about Glenn specifically.**  Also, Joiner asked A.B. about

her grandmother, and A.B. stated that her grandmother had touched her as well.

### d. Tomiko Mackey

¶10.    Tomiko Mackey, a licensed clinical social worker, was accepted as an expert in the

field of forensic interviewing.  Through Finding Words Mississippi, Mackey conducted

forensic interviews and trained others in the field.

*Appendix A5*

¶11.    Mackey testified that Joiner had followed the proper protocol during A.B.'s forensic interview. But Mackey took issue with some of Joiner's methods of questioning. First, Mackey indicated that Joiner had asked A.B. several questions at once without giving her an opportunity to respond. Second, Mackey mentioned several times that Joiner had questioned A.B. about the defendants in groups instead of addressing each defendant individually. And third, Mackey testified that Joiner had improperly led A.B. when she inquired about Glenn.

¶12.    Despite these issues, Mackey observed that A.B. was able to disclose the events, and she consistently named Tim, Glenn, and Johnny as the perpetrators. As a result, Mackey opined that A.B.'s disclosures were consistent with those of a child who had been sexually abused.

### e. Dr. Thomas Fowlkes

¶13.    Dr. Thomas Fowlkes, who specializes in emergency medicine and correctional medicine, treated Krystal for alcohol and drug abuse and psychiatric illness while she was incarcerated at the Lafayette County Detention Center. Dr. Fowlkes testified that Krystal had expressed a desire to commit suicide, so he prescribed her an antidepressant. Dr. Fowlkes also put Krystal on antipsychotic medication. When asked about Krystal's mental capacity, Dr. Fowlkes testified that Krystal was tested and determined to be mildly retarded, which stemmed from her drug use.

### f. Krystal Jordan

¶14.    Krystal admitted she had a history of drug abuse, and she had a sexual relationship with all three defendants. Krystal stated that A.B.'s sexual abuse began when she was pregnant with C.B., Krystal and Tim's youngest daughter. During Krystal's pregnancy, Tim

*Appendix A6*    6

asked Krystal if he could have sex with A.B. Krystal agreed, and she assisted Tim in sexually penetrating the child while they were in the shower. Krystal testified that A.B. screamed and yelled for help during the sexual assault. During subsequent sexual assaults, Krystal drugged the child with Lortab to keep her calm. Krystal also testified that Tim sexually assaulted A.B. a second time in their home.

¶15. After C.B. was born in May 2005, Krystal and Tim, along with their children, moved to Johnny's trailer. Krystal testified that Tim continued to sexually abuse A.B. Eventually, Glenn found out about Tim's acts and requested to have sex with A.B. as well; Krystal obliged. Krystal described one incident in which Glenn and Tim took turns sexually assaulting A.B. When Johnny learned that the other men were having sex with A.B., he requested to have sex with her as well. Johnny is wheelchair bound and suffers from rheumatoid arthritis, making it difficult for him to use his hands. Because of Johnny's physical impairments, Krystal helped Johnny sexually assault A.B. by removing their clothes and by sitting A.B. on top of Johnny. Krystal also described how she taught A.B. to perform oral sex on Johnny. Krystal testified that, in total, Glenn had sex with A.B. approximately three or four times, and Johnny had sex with A.B. twice.

¶16. On cross-examination, the defense presented several letters that Krystal wrote to the defendants while they were incarcerated; Krystal denied writing some of the letters. However, in these letters, Krystal maintained her innocence and that of the defendants. When questioned regarding specific passages in the letters, Krystal claimed that she could not recall what her words meant. The defense also questioned Krystal about her plea agreement. Krystal had difficulty answering the questions, but she did acknowledge that she


Appendix A

7

received a plea deal and stated that she did not think the State would take away her plea deal if she did not testify against the defendants.

### g. Pammie Davidson

¶17.    Pammie Davidson was employed with the district attorney's office as the victim's advocate coordinator, and she helped prepare Krystal for trial. The State questioned Davidson about prior statements that Krystal made to her regarding Tim, Glenn, and Johnny. The defense objected on the ground of hearsay. However, the trial court allowed Davidson's testimony as a prior consistent statement under Mississippi Rule of Evidence 801(d)(1)(B).

### h. Carnelia Fondren

¶18.    Next, the State called Krystal's attorney, Carnelia Fondren. The defense objected arguing that: (1) Fondren was not disclosed as a witness; (2) they were not prepared to examine her; (3) any information that Fondren could relay was protected by the attorney/client privilege; and (4) Fondren's testimony would amount to hearsay. The State countered that Fondren's testimony was admissible as a prior consistent statement under Mississippi Rule of Evidence 801(d)(1)(b). The trial court allowed Fondren's testimony and gave the defense an opportunity to question Fondren before she took the stand.

¶19.    On direct-examination, Fondren testified about the particulars of Krystal's plea agreement with the State. Fondren stated that she had talked to Krystal extensively about her involvement in the crimes against A.B. Krystal admitted to Fondren that she had helped Tim, Glenn, and Johnny sexually assault A.B. Based on this, Fondren felt as if Krystal was justified in pleading guilty to the charges. Fondren approached the State to negotiate a plea deal for Krystal. The State offered to recommend that Krystal serve a total of twenty years

*Appendix A8*      8

with ten years suspended in exchange for her cooperation in this case.

¶20.    During Fondren's cross-examination, the defense elicited that Krystal was also charged with sexual battery against Martha. On the same day that Krystal entered her guilty plea, this charge of sexual battery was dropped.

¶21.    After Fondren's testimony, the defense moved for a mistrial. The defense argued that Fondren's testimony was improper opinion testimony and prejudicial to the defendants. The defense argued that Fondren's testimony was used to suggest that since Krystal pled guilty, Tim, Glenn, and Johnny were also guilty.

¶22.    The trial court ruled that the defense opened the door to Fondren's testimony by implying that Krystal's plea deal was obtained by fraud. Further, the trial court explained that this made the testimony relevant and admissible as to whether there was a legitimate basis for Krystal's guilty plea. Accordingly, the trial court denied the motion.

### i. Dr. Tanya King

¶23.    Dr. Tanya King, a pediatrician with training in the area of child abuse and neglect, examined A.B. at the request of DHS. Dr. King testified that A.B.'s genitalia were red and inflamed. She found bruising on both sides of the opening of A.B.'s vagina. Dr. King testified that A.B.'s hymen was not torn. But a young girl's vagina is small, and the hymen is recessed, making it difficult for the perpetrator to totally penetrate the child. Also, Dr. King testified that A.B.'s anus was dilated, which typically results from repeated penetration by an object. Dr. King testified that she had never seen a child's anus damaged to that degree.

### j. Robin Smith

*Appendix A9*          9

¶24.    Robin Smith was A.B.'s therapist. She testified that A.B. consistently disclosed to her that Krystal, Tim, Glenn, and Johnny had touched her inappropriately. Smith also testified regarding A.B.'s behavioral issues. A.B. used vulgar language, exhibited cruelty toward the family dog and her sister, touched other children and adults inappropriately, expressed desires to touch someone or to have someone touch her, rubbed the private parts of models in magazine ads, and ate her own feces. Smith testified that A.B.'s behavior was consistent with that of a child who has been sexually abused. Smith also stated that A.B. would revert to these behaviors whenever she was questioned about her sexual battery, which negatively impacted A.B.'s psychological health.

### II. Timothy Jordan's Case-In-Chief

¶25.    Tim's character witnesses testified that Tim was a good father and would not hurt his child. In addition, Alice Jordan, Tim's mother, and Danielle Fortner, Tim's niece, testified that they babysat A.B. A.B. never complained to them about vaginal pain, and they did not notice anything abnormal about the child's genitalia. Also, Donald Jordan and Carlee Hudson, two of Tim's siblings, testified that they never heard the child complain of genital pain.

¶26.    Tim admitted to using drugs and drinking alcohol. Tim also admitted having knowledge of Krystal's extramarital affairs, including participating in a ménage à trois with Glenn and Krystal. But Tim denied sexually abusing his daughter. Tim testified that he did not know that A.B. was sexually abused in 2005, and he did not think that Glenn or Johnny would hurt A.B. Tim also testified regarding several letters Krystal wrote to him while he was incarcerated. In those letters, Krystal proclaimed their innocence and denied knowing

*Appendix A10*                    10

who had sexually abused A.B.

### III. Glenn Grose's Case-In-Chief

¶27.    Glenn presented several character witnesses, who testified that Glenn would not harm a child. The witnesses also acknowledged Glenn's drug and alcohol problem. Stacey Lindsey, who dated Glenn, testified that Glenn could not function sexually when he was intoxicated or "high."

¶28.    Glenn admitted that he had a history of drug and alcohol abuse. He also testified that he does not like to have sex when he is "using." Glenn also admitted participating in a ménage à trios with Tim and Krystal. But Glenn stated that A.B. was asleep on the floor during the sexual encounter, and the child was not involved in the act. Glenn testified that he had no idea that A.B. was being sexually abused. Glenn mentioned several other men who had been around A.B., but he did not suggest that the other men were responsible for A.B.'s sexual battery. Glenn also testified that Krystal had written him several letters while he was incarcerated. In those letters, Krystal proclaimed their innocence and stated that she did not know who had sexually assaulted A.B.

### IV. Johnny Grose's Case-In-Chief

¶29.    Johnny presented several witnesses, who testified about his physical condition, general character, and interactions with A.B. Sherry Powell, Johnny's home health nurse testified that Johnny was wheelchair bound and had rheumatoid arthritis, which made it difficult for him to use his hands. Margie Tidwell, Johnny's sister, relayed the same information about Johnny's physical condition. Tidwell observed A.B. around Johnny, and she testified that there was not much interaction between the two. Also, Tidwell disclosed

*Appendix A 11*     11

that she made the initial report to DHS because Krystal was not taking care of her children and having sex with three of her brothers, which caused arguments in their family. Mary Sue Williams, Johnny's ex-girlfriend, testified that she and Johnny were sexually intimate. But because of Johnny's physical condition, sex was difficult, and she had to do all of the "work."

¶30.    Johnny admitted having a sexual relationship with Krystal. He denied sexually abusing A.B. and testified that he had no knowledge that A.B. was being sexually abused.

## ANALYSIS

### I. Motion for Severance

¶31.    Tim argues that the trial court erred by denying his motion for severance. Glenn and Johnny did not join in this motion. The State argues that neither defendant implicated each other in the alleged crimes; thus, Tim suffered no prejudice and severance was not required.

¶32.    The grant or denial of a motion for severance is within the trial court's sound discretion. *Sanders v. State*, 942 So. 2d 156, 158 (¶10) (Miss. 2006) (quoting Uniform Rule of Circuit and County Court 9.03). Thus, we review the trial court's ruling for an abuse of discretion. *Id.*

¶33.    Co-defendants are not automatically entitled to separate trials. *Id.* at (¶11). When determining whether to grant or deny a motion to sever, the trial court considers (1) whether a co-defendant attempts to exonerate himself at the expense of another co-defendant, and (2) whether the weight of the evidence goes more to the guilt of one co-defendant over another. *Id.* In this case, the trial court ruled that there was no evidence that the co-defendants' defenses were in conflict.

*Appendix A12*    12

¶34.   Tim maintains that his defense and that of his co-defendants were diametrically opposed, and all sought to exculpate themselves at the expense of the others.  On the contrary, a review of the record shows that neither co-defendant implicated another co-defendant in the crime.  In fact, Tim testified that he did not think Glenn and Johnny would hurt A.B.  Also, the evidence did not go more toward the guilt of any one defendant over the other.  We find that the defendants were not prejudiced by the joint trial.  Thus, the trial court did not abuse its discretion by denying Tim's motion for severance.

## II. Amendment to the Indictment

¶35.   Initially, each count of the indictment alleged that the event occurred in a particular month.  But the State amended each count in the indictment expanding the time to stretch over several months. Tim, Glenn, and Johnny argue that the trial court erred by allowing the State to amend the indictment because: (1) it was an improper amendment to the substance of the indictment; (2) changing the dates was prejudicial to their defense; (3) the amendment made all of the counts identical; and (4) the amendment confused the jury.

¶36.   An indictment may not be amended if the amendment is one of substance, except by action of the grand jury.  *Spears v. State*, 942 So. 2d 772, 774 (¶6) (Miss. 2006).  But the indictment may be amended if the change is simply to the form of the indictment.  *Id.*  "It is well settled . . . that a change in the indictment is permissible if it does not materially alter facts which are the essence of the offense on the face of the indictment as it originally stood or materially alter a defense to the indictment as it originally stood so as to prejudice the defendant's case."  *Id.* (quoting *Miller v. State*, 740 So. 2d 858, 862 (¶13) (Miss. 1999)).

¶37.   Mississippi Code Annotated section 99-7-5 (Rev. 2007) specifically addresses

*Appendix A13*   13

allegations of time in an indictment and provides that:

> An indictment for any offense shall not be insufficient for omitting to state the
> time at which the offense was committed in any case where time is not of the
> essence of the offense, nor for stating the time imperfectly . . . .

Moreover, Uniform Rule of Circuit and County Court 7.06 provides that the failure to state

the correct date in an indictment does not render the indictment insufficient.

¶38.    Time is not an essential element of the crimes of sexual battery, gratification of lust,

and child abuse. *See* Miss. Code Ann. § 97-3-95(1)(d) (Rev. 2006); Miss. Code Ann. § 97-5-

23 (Rev. 2006); Miss. Code Ann. § 97-5-39(1)(c) (Rev. 2006).   Therefore, the amendment

was one of form; thus, it was allowable.  Tim's, Glenn's, and Johnny's defenses were simply

that they had not sexually abused A.B.  This defense could have been presented no matter

what dates were alleged in the indictment. *See Leonard v. State*, 972 So. 2d 24, 29 (¶18)

(Miss. Ct. App. 2008).   Thus, we find that the defendants were not prejudiced by the

amendment to the indictment.  This issue is without merit.

**III.  Tender-Years Exception, Forensic Interview, and Hearsay**

¶39.    Tim, Glenn, and Johnny argue that the tender-years exception was not properly

applied in this case because: (1) A.B. was not unavailable to testify; (2) A.B.'s statements

were not reliable, including those made during the forensic interview; and (3) the statements

were testimonial in nature, violating their right to confrontation under *Crawford v.

Washington*, 541 U.S. 36 (2004).

¶40.    When reviewing the admission of evidence, we will not disturb the trial court's ruling

absent a finding of abuse of discretion. *Hobgood v. State*, 926 So. 2d 847, 852 (¶11) (Miss.

2006).  Under Mississippi Rule of Evidence 803(25), statements made by a child regarding

*Appendix A14*

sexual abuse may be admissible as an exception to the hearsay rule. In pertinent part, the trial court must determine that: (1) "the time, content, and circumstances of the statement provide substantial indicia of reliability"; and (2) the child "is unavailable as a witness . . . [and] there is corroborative evidence of the act." *Id.*

¶41. The supreme court has held "that there is a rebuttable presumption that a child under the age of twelve is of tender years." *Veasley v. State*, 735 So. 2d 432, 436 (¶16) (Miss. 1999). At the time these alleged events occurred, A.B. was three years old. Thus, there existed a rebuttable presumption that A.B. was a child of tender years. Based on A.B.'s behavioral issues, Smith, A.B.'s therapist, opined that further questioning about the events would negatively affect A.B.'s mental health. We find that the trial court did not abuse its discretion by determining that A.B.'s health and welfare would be greatly affected by testifying and that she was unavailable as a witness. *See Britt v. State*, 844 So. 2d 1180, 1184 (¶¶12-14) (Miss. Ct. App. 2003).

¶42. The trial court conducted a thorough examination to determine whether A.B.'s statements possessed substantial indicia of reliability. Using the twelve factors listed in the comment to Rule 803(25), the trial court determined that: (1) A.B. had no motive to lie; (2) the general character of the declarant was a neutral factor given A.B.'s age; (3) she repeated her statements to multiple persons; (4) the statements were spontaneous; (5) the timing of the declarations was a neutral factor; (6) the relationship between A.B. and the witnesses favored admission; (7) whether A.B.'s recollection was faulty was a neutral factor; (8) the statements were certainly made; (9) the persons testifying about the statements were credible; (10) A.B.'s age did not favor admission; (11) most of A.B.'s statements were made in a

*Appendix A15*  15

non-suggestive environment; and (12) the statements were not fabricated. Overall, the trial court determined that A.B.'s statements possessed substantial indicia of reliability.

¶43. Tim, Glenn, and Johnny argue that A.B.'s statements were inconsistent during the forensic interview, and the questions were sometimes leading. But the trial court determined that, as a whole, A.B.'s statements possessed substantial indicia of reliability because the statements were repeated in non-suggestive environments. We find that there is substantial evidence to support the trial court's ruling.

¶44. In *Crawford*, the United States Supreme Court held that under the Confrontation Clause of the Sixth Amendment, testimonial hearsay was not admissible unless the defendant had an opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 59. The Mississippi Supreme Court has determined that "a statement is testimonial when it is given to the police or individuals working in connection with the police for the purpose of prosecuting the accused." *Hobgood*, 926 So. 2d at 852 (¶12).

¶45. In this case, A.B.'s forensic interview was set up by DHS and administered by a non-profit entity; it did not arise based on a police investigation. *Contra Williams v. State*, 970 So. 2d 727, 734 (¶22) (Miss. Ct. App. 2007) (finding that because law enforcement was closely involved in obtaining a forensic interview, it was testimonial in nature). Also, statements A.B. made to Smith occurred in the course of therapy. *See Hobgood*, 926 So. 2d at 852 (¶13). Because the statements were not testimonial in nature, we find that the defendants' Sixth Amendment rights were not violated. However, even if the forensic interview were to be classified as testimonial, its admission would be harmless error. In the forensic interview, A.B. identified Tim, Glenn, Johnny, and Krystal as the persons who had

*Appendix A16*    16

sexually abused her. This same information was admitted into evidence through the testimony of Krystal, A.B.'s mother, who was a participant and a direct eyewitness to the sexual abuse of A.B. by the appellants. Thus, this issue is without merit.

### IV. Leading Questions in Krystal's Direct-Examination

¶46. Johnny is the only defendant who raises this issue. Whether to allow leading questions rests within the trial court's discretion. *Harris v. State*, 979 So. 2d 721, 730-31 (¶29) (Miss. Ct. App. 2008). "Unless there has been a manifest abuse of discretion resulting in injury to the complaining party, we will not reverse the decision. This is because the harm caused is usually speculative and likely inconsiderable and only the trial court was able to observe the demeanor of the witness to determine the harm." *Id.* at 731 (¶29) (quoting *Mosby v. State*, 749 So. 2d 1090, 1093 (¶9) (Miss. Ct. App. 1999)).

¶47. Based on our review of the record, the State asked Krystal leading questions in an effort to get her to describe details of events. For instance, the State asked Krystal several leading questions to describe Krystal's teaching A.B. to perform oral sex on Johnny. The trial court was in the best position to determine whether leading questions were necessary to develop Krystal's testimony. Because of Krystal's diminished mental capacity, the trial court allowed the State to ask her leading questions. Based upon our review of the record, we cannot find that the trial court abused its discretion. This issue is without merit.

### V. Pammie Davidson's and Carnelia Fondren's Testimonies

¶48. Whether to grant or deny a motion for a mistrial is within the sound discretion of the trial court and will be reviewed for an abuse of discretion. *Rollins v. State*, 970 So. 2d 716, 720 (¶10) (Miss. 2007).



17

### A. Pammie Davidson

¶49.    Under this assignment of error, only Johnny argues that the trial court erred by allowing Davidson's testimony as a prior consistent statement.  It is important to note that Johnny failed to object to Davidson's testimony at trial.  However, since Tim objected, we will address this issue on the merits.

¶50.    Mississippi Rule of Evidence 801(d)(1)(B), which provides that:

> A statement is not hearsay if . . . . The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.

The supreme court has held that "a prior consistent statement introduced to rebut a charge of recent fabrication or improper influence or motive was admissible if the statement had been made before the alleged fabrication, influence, or motive came into being, but it was inadmissible if made afterwards." *Owens v. State*, 666 So. 2d 814, 816 (Miss. 1995).

¶51.    Based on our review of the record, the defense attempted to imply that Krystal had changed her story in exchange for her plea deal.  The State attempted to rebut the charge with prior consistent statements.  Davidson was allowed to testify about the disclosures Krystal made to her while she was preparing Krystal for trial. But based on the law, Davidson's testimony did not qualify as a prior consistent statement.  Any statement Krystal relayed to Davidson occurred after Krystal had entered her guilty plea and in preparation of trial. However, outside of Davidson's testimony, there was other substantial proof of A.B.'s allegations against the defendants. Thus, we find that the admission of Davidson's testimony is harmless error. *See id* at 817.

*Appendix A18*   18

### B. Carnelia Fondren

¶52.    Tim, Glenn, and Johnny argue that: Fondren's testimony should have been excluded due to a discovery violation; the trial court erred by allowing Fondren's testimony as a prior consistent statement; and Fondren improperly bolstered Krystal's credibility and gave improper opinion testimony.

¶53.    In regard to the alleged discovery violation, the defendants argue that Fondren's testimony should have been excluded because the State had failed to identify her as a witness pursuant to Uniform Rule of Circuit and County Court 9.04.  The State explained to the trial court and the defendants that Fondren would testify about Krystal's plea agreement and prior consistent statements regarding who had sexually abused A.B.  The trial court allowed the defense an opportunity to question Fondren before she took the stand.  Rule 9.04(I)(a) provides that:

> If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.

The defendants had knowledge of what Fondren would testify to, and they did not claim undue surprise or unfair prejudice or seek a continuance or mistrial after having an opportunity to examine Fondren outside of the presence of the jury.  Thus, the defendants waived the discovery-violation issue.  *See Comby v. State*, 901 So. 2d 1282, 1287 (¶12) (Miss. Ct. App. 2004).

¶54.    During Krystal's cross-examination, the defense showed that Krystal's testimony was the product of a plea agreement and implied that Krystal had motivation to fabricate this

*Appendix A*   19

story against the defendants. Thus, the defense opened the door, allowing the State to present rebuttal evidence. *See Jackson v. State*, 766 So. 2d 795, 808 (¶40) (Miss. Ct. App. 2000). Fondren was allowed to testify about the particulars of Krystal's plea agreement and the disclosures Krystal had made to her about this case. Fondren testified that Krystal originally denied any involvement in the acts. However, as Fondren and Krystal established a relationship, Krystal finally admitted her guilt as to the crimes charged against her. Thereafter, the State offered a recommended sentence in exchange for Krystal's cooperation in the defendants' cases. Because Krystal admitted to helping the defendants sexually abuse A.B., Fondren opined that Krystal was justified in entering a guilty plea to the charges.

¶55.   The supreme court has held that an accomplice's testimony that he or she had previously entered a guilty plea to the same charge that the defendant is being tried for is evidence of a prior consistent statement. *Hathorne v. State*, 759 So. 2d 1127, 1132 (¶26) (Miss. 1999). In addition, it is at times appropriate for a third person to testify to rebut a charge of improper influence or recent fabrication. *Williams v. State*, 749 So. 2d 159, 164 (¶27) (Miss. Ct. App. 1999) (citing *Hosford v. State*, 560 So. 2d 163, 168 (Miss. 1990)). Based on our review of the record and in light of Krystal's diminished mental capacity, we find that Fondren's testimony was a proper rebuttal to the defense's charge of recent fabrication, and it was not a bolstering of witness credibility. This issue is without merit.

### VI. Gloria's Pending Drug Charge

¶56.   Glenn is the only defendant who raises this argument. The State made a motion in limine to exclude evidence regarding Gloria's pending drug charge. The trial court sustained the motion. But defense counsel was allowed to question Gloria about the pending charge

*Appendix A20*   20

during cross-examination. Thus, we find that this issue is moot.

### VII. Weight of the Evidence

¶57.    Tim, Glenn, and Johnny made separate motions for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, which the trial court denied. In support of their respective motions, the defendants maintained that: A.B.'s statements were inconsistent; Krystal was not a credible witness; and there was no direct evidence linking them to the sexual abuse and child neglect.

¶58.    A motion for a JNOV challenges the legal sufficiency of the evidence. *Pratt v. State*, 870 So. 2d 1241, 1246 (¶13) (Miss. Ct. App. 2004). We will not disturb the trial court's ruling unless, "with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." *Id.* at 1247 (¶14). On the other hand, a motion for a new trial challenges the weight of the evidence. *Id.* at 1248 (¶20). We will not disturb the trial court's ruling unless "the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.*

¶59.    The defendants argue that there is no direct evidence linking them to the sexual abuse. They also contend that they were unaware that A.B. had been sexually abused; thus, they cannot be guilty of child neglect. Dr. King's medical examination of A.B. revealed that the child had been sexually abused. In addition, many witnesses testified that A.B. identified Tim, Glenn, and Johnny as the persons who had abused her. Witness testimony alone is sufficient to secure a conviction. *See Lattimer v. State*, 952 So. 2d 206, 224 (¶55) (Miss. Ct. App. 2006).

*Appendix A21*    21

¶60.    Specifically, Martha and Gloria testified that A.B. disclosed to them that Tim had hurt her "down there." During the forensic interview, A.B. said that Tim had touched her vagina with his penis, and she demonstrated the act using anatomically correct dolls. Smith testified that A.B. accused Tim of abusing her.    A.B. also told Smith about the shower incident. Furthermore, Krystal's testimony corroborated A.B.'s disclosures.    This evidence is sufficient to support Tim's convictions.

¶61.    In regard to Glenn, A.B. disclosed to Martha and Gloria that Glenn had hurt her vagina.  Although Joiner introduced Glenn's name into A.B.'s forensic interview, Mackey opined that A.B.'s disclosures were consistent with those of a child who had been sexually abused. During the interview, A.B. said multiple times that Glenn had touched her "nu-nu." She stated that she saw Glenn's penis, and Glenn had touched her with his penis.  A.B. also revealed to Smith that Glenn had sexually abused her.    In addition, Krystal's testimony corroborated A.B.'s disclosures. This evidence is sufficient to support Glenn's convictions.

¶62.    As for Johnny, Martha and Gloria testified that A.B. had named Johnny as one of her abusers.  During the forensic interview, A.B. identified Johnny as someone who had touched her "nu-nu," and she said that she had seen Johnny's penis.    A.B. also revealed this information to Smith. Specifically, Johnny argues that he could not have had sex with A.B. given his physical condition.  There was testimony that it was difficult for Johnny to have sex, not that it was impossible.  Krystal testified that she helped Johnny penetrate A.B. "[O]nly slight penetration is required to constitute the offense."  *Pryer v. State*, 958 So. 2d 818, 823 (¶13) (Miss. Ct. App. 2007) (citing *Johnson v. State*, 626 So. 2d 631, 632-33 (Miss. 1993)). This evidence is sufficient to support Johnny's convictions.

*Appendix A* 22/22

¶63.    The defendants also attack the credibility of the witnesses. It is a long-standing rule that the credibility of a witness is a question for the jury. *Smith v. State*, 989 So. 2d 973, 984 (¶40) (Miss. Ct. App. 2008). First, the defendants attack A.B.'s credibility because of inconsistent statements she gave during the forensic interview. Yet, testimony from Martha, Gloria, Shaw, and Smith showed consistency in A.B.'s allegations. Also, the testimony regarding A.B.'s behavior – masturbation, fondling others, and so on – showed that A.B. exhibited physical and mental characteristics of a child who had been sexually abused. Based on this evidence, we find that a reasonable jury could have determined that the defendants were guilty beyond a reasonable doubt.

¶64.    The defendants also attack Krystal's credibility, labeling her a mildly retarded drug addict. They mainly criticize Krystal for recanting her innocence and maintain that she fabricated the allegations to receive her plea deal. As evidenced by Krystal's letters that were admitted into evidence, she changed her story. The defense was allowed to cross-examine her on this point and to question her about the plea agreement. Where there is conflicting evidence, it is within the jury's province to determine the credibility of the witness. *See id.* After hearing all of the evidence, the jury resolved any conflicts in the evidence in favor of convicting the defendants. The verdicts are not contrary to the overwhelming weight of the evidence. Thus, we will not disturb the jury's verdicts. This issue is without merit.

¶65.    **THE JUDGMENT OF THE CIRCUIT COURT OF LAFAYETTE COUNTY OF CONVICTION OF TIMOTHY JORDAN OF FOUR COUNTS OF SEXUAL BATTERY AND SENTENCE OF LIFE FOR EACH COUNT, WITH THE LIFE SENTENCES TO RUN CONCURRENTLY; ONE COUNT OF GRATIFICATION OF LUST AND SENTENCE OF TEN YEARS; AND ONE COUNT OF CHILD**

*Appendix A23*

NEGLECT AND SENTENCE OF TEN YEARS, WITH THE TWO TEN-YEAR SENTENCES TO RUN CONCURRENTLY WITH EACH OTHER BUT CONSECUTIVELY TO THE LIFE SENTENCES, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED.

¶66.   THE JUDGMENT OF THE CIRCUIT COURT OF LAFAYETTE COUNTY OF CONVICTION OF GLENN GROSE OF THREE COUNTS OF SEXUAL BATTERY AND SENTENCE AS A HABITUAL OFFENDER TO LIFE FOR EACH COUNT AND ONE COUNT OF CHILD NEGLECT AND SENTENCE AS A HABITUAL OFFENDER OF TEN YEARS, WITH THE SENTENCES TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED.

¶67.   THE JUDGMENT OF THE CIRCUIT COURT OF LAFAYETTE COUNTY OF CONVICTION OF JOHNNY GROSE OF TWO COUNTS OF SEXUAL BATTERY AND SENTENCE OF LIFE FOR EACH COUNT, WITH THE LIFE SENTENCES TO RUN CONCURRENTLY; ONE COUNT OF GRATIFICATION OF LUST AND SENTENCE OF TEN YEARS; AND ONE COUNT OF CHILD NEGLECT AND SENTENCE OF TEN YEARS, WITH THE TWO TEN-YEAR SENTENCES TO RUN CONCURRENTLY WITH EACH OTHER BUT CONSECUTIVELY TO THE LIFE SENTENCES, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED.

¶68.   ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAFAYETTE COUNTY.

   LEE AND MYERS, P.JJ., GRIFFIS, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.   BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.   IRVING, J., NOT PARTICIPATING.

Appendix A24

*Exhibit #C*

Serial: 169857

## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### No. 2008-KA-01761-COA

*TIMOTHY W. JORDAN, GLENN E.*         **F I L E D**        *Appellants*
*GROSE AND JOHNNY GROSE*

JUN 0 7 2011

*v.*

SUPREME COURT CLERK

*STATE OF MISSISSIPPI*                               *Appellee*

### ORDER

This matter is before the Court upon the motions for rehearing. The Court finds that the motions are not well taken and should be denied.

IT IS THEREFORE ORDERED that the motions for rehearing are denied.

SO ORDERED, this the _27th_ day of May, 2011.

_____

L. JOSEPH LEE, CHIEF JUDGE

Irving, P.J., and Russell, J., not participating.

Exhibit # D

# Questions Presented To THIS Honorable Court Respectfully Submitted.

**I.** Why The Trial Court erred by allowing into evidence the forensic interview of B.J. Because the interview did not have sufficient Indicia of Reliability and did not have sufficient indicia of reliability and the Interview's admission violated - Crawford v Washington (p.8) of Brief 541 U.S. 36 (2004)

**II.** Why The Trial Court erred by allowing not the defense to Cross Examine the State's Witness Gloria Becerill about his pending drug charge in pontotoc County, Violating his Sixth Amendment Rights To Cross Examination and Contrary To Giglio and Napue As Well as Miss R. Evid.616 (p.15) of Brief

**III.** Why The Trial Court Erred When it did not grant a mistrial regarding the testimony of Carnelia Fondren. (p.19) of Brief

**IV.** Why The Trial Court Erred When it allowed the state to amend the indictment to add Substantative Changes and this error violated Mr. Glen Grose's Sixth Amendment Rights. (p.26) of Brief

**V.** Why There was insufficient evidence to convict Glen Grose And as such his Case should be reversed and rendered, additionally the Verdict was against the overwhelming weight of the evidence and the trial court erred by not Granting a new trial. (p.30) of Brief

(Wherefore)

**VI.** Petitioner Glen Grose (Appellant) asserts that he is entitled to a dismissal of his charges in there entirety or alternatively a reversal and remand for a new trial in Light of the individual and Cumulative errors set forth in his brief, and prays this Honorable Court will grant him as much, respectfully submitted, it is soprayed.

**VII.** Conclusion (p.51) of Brief

Certificate of Service (p.52) of Brief

2

*Exhibit E*

Serial: **171811**

## IN THE SUPREME COURT OF MISSISSIPPI

### No. 2008-CT-01761-SCT

*TIMOTHY W. JORDAN, GLENN E. GROSE*
*AND JOHNNY GROSE*

*v.*

*STATE OF MISSISSIPPI*

**F I L E D**

SEP 0 8 2011

SUPREME COURT CLERK

### ORDER

This matter is before the Court on four petitions for writ of certiorari filed by Jordan and the Groses. After due consideration, the Court finds that each petition should be granted.

IT IS THEREFORE ORDERED that the Petition for Writ of Certiorari filed by counsel for Timothy W. Jordan is granted.

IT IS FURTHER ORDERED that the Petition for Writ of Certiorari filed by counsel for Johnny Grose is granted.

IT IS FURTHER ORDERED that the Petition for Writ of Certiorari filed by counsel for Glenn E. Grose is granted.

IT IS FURTHER ORDERED that the Petition for Writ of Certiorari filed pro se by Glenn E. Grose is granted.

SO ORDERED, this the ___8___ day of September, 2011.

David Anthony Chandler

DAVID ANTHONY CHANDLER, JUSTICE

TO GRANT EACH PETITION: WALLER, C.J., CARLSON AND DICKINSON, P.JJ., KITCHENS AND CHANDLER, JJ.

TO DENY EACH PETITION: RANDOLPH AND PIERCE, JJ.

NOT PARTICIPATING:   LAMAR AND KING, JJ.

2

Exhibit #F

Serial: 174676

# IN THE SUPREME COURT OF MISSISSIPPI

## No. 2008-CT-01761-SCT

*TIMOTHY W. JORDAN, GLENN E. GROSE*
*AND JOHNNY GROSE*

**F I L E D**

FEB 1 6 2012

*v.*

SUPREME COURT CLERK

*STATE OF MISSISSIPPI*

## ORDER

This matter came before the Court en banc on the Court's own motion. The Court, by

order entered on September 8, 2011, granted the separate petitions for writ of certiorari filed by

Timothy W. Jordan, Glenn E. Grose and Johnny Grose, through their respective counsel, as well

as a petition for writ of certiorari filed by Glenn E. Grose, pro se in order to carefully review the

issues and the record in this matter. Having done so, the Court now finds that there is no need

for further review, and that the writs of certiorari should be dismissed.

IT IS THEREFORE ORDERED that the four writs of certiorari are hereby dismissed.

SO ORDERED, this the /6 day of February, 2012.

GEORGE C. CARLSON, JR.
PRESIDING JUSTICE
FOR THE COURT

TO DISMISS: WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR
AND PIERCE, JJ.

CHANDLER, J., OBJECTS TO THE ORDER WITH SEPARATE WRITTEN STATEMENT
JOINED BY KITCHENS, J.

KING, J., NOT PARTICIPATING



Exhibit #G

## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 2008-CT-01761-SCT

*TIMOTHY W. JORDAN, GLENN E.*
*GROSE AND JOHNNY GROSE*

*v.*

*STATE OF MISSISSIPPI*

**F I L E D**

FEB 1 6 2012

**SUPREME COURT CLERK**

### CHANDLER, JUSTICE, OBJECTING TO THE ORDER WITH SEPARATE WRITTEN STATEMENT:

¶1.     Because my review of the issues and record indicates a new trial is warranted, I do not

join the Court's order. I would reverse and remand for a new trial based upon the admission

of videotaped hearsay statements in violation of the defendants' right of confrontation

guaranteed by the Sixth Amendment to the United States Constitution, and the admission of

hearsay testimony given by an accomplice's attorney.

## FACTUAL BACKGROUND

¶2.     This Court granted certiorari to review the Court of Appeals' decision affirming the

convictions of Timothy Jordan (Tim), Glenn E. Grose (Glenn), and Johnny Grose (Johnny)

of multiple counts of sexual battery, gratification of lust, and child neglect concerning Tim's

daughter, A.B.[1] *Jordan v. State*, 2010 WL 3547997 (Miss. Ct. App. Sept. 14, 2011). The

defendants each received multiple life sentences after their joint trial.  At the trial, evidence

established that A.B. had been sexually abused over a period of several months.  The State

bore the burden to prove beyond a reasonable doubt that the perpetrators of that abuse were

Tim, Glenn, and Johnny.  The State's evidence of their guilt consisted of a videotaped

---

[1] The child's name has been changed to protect her identity.

statement of A.B. in which she named Tim, Glenn, and Johnny as her abusers, A.B.'s statements to her grandmother, great-grandmother, and therapist that her abusers were Tim, Glenn, and Johnny,[2] and the testimony of A.B.'s mother, Krystal Jordan, that she had assisted Tim, Glenn, and Johnny in sexually abusing A.B. Krystal, who is mentally retarded, gave this testimony as a condition of her plea agreement with the State. Tim, Glenn, and Johnny all testified and denied that they had sexually abused A.B.

¶3    A.B., the daughter of Tim and Krystal Jordan, was three years old at the time of the conduct alleged in the indictment. In May 2005, Tim, Krystal, and A.B. went to stay with A.B.'s great-grandmother, Martha Hester Grose, and her husband, Larry Grose, who lived with Johnny at Johnny's trailer. Johnny was disabled from rheumatoid arthritis and confined to a wheelchair. His brother, Glenn, lived in a house on the property but was a frequent visitor to the trailer. Witnesses established that A.B. frequently was in the company or care of Tim, Glenn, Johnny, and Larry, as well as other men.

¶4.    On October 30, 2005, A.B. disclosed to Martha that Tim, Krystal, Glenn, and Johnny had sexually abused her. The next day, Martha brought A.B. to the home of her daughter, A.B.'s grandmother, Gloria Beccaril. A.B. said that Tim, Glenn, and Johnny had touched her.[3] Immediately, Beccaril contacted Rhiannon Shaw, a family-protection specialist with the Mississippi Department of Human Services (DHS). Shaw recently had begun an investigation into the conditions at the Jordan home due to a report of child neglect and that

---

[2] A.B.'s therapist testified A.B. consistently said that "Larry" also had abused her.

[3] Beccaril testified that, on a later occasion, A.B. had told her that Larry had touched her. No criminal proceedings were instigated against Larry Grose in connection with A.B.

Krystal was prostituting herself in exchange for drugs.

¶5. Shaw arranged a forensic interview of A.B. on November 3, 2005. After the forensic interview, A.B. underwent a medical examination by a pediatrician that confirmed that A.B. had been sexually abused. The pediatrician testified that A.B. had inflammation and bruising on her genitalia and that her anus was dilated, which was the result of repeated penetration over months.

*The forensic interview*

¶6. The forensic interview was conducted by Ejeera Joiner at Family Crisis Services, a nonprofit entity. Shaw testified that she and another Family Crisis Services employee had observed the interview through a two-way mirror, and the interview was videotaped. After a pretrial hearing, the trial court admitted the videotape of the interview under the tender-years exception to the hearsay rule after finding that A.B. was unavailable to testify due to the substantial likelihood she would be psychologically traumatized by testifying. *See* M.R.E. 804(a)(6); M.R.E. 803(25). Shaw authenticated the videotaped interview that was played for the jury.

¶7. Joiner did not testify. Tomiko Mackey, an expert in forensic interviewing, testified that she had studied the videotape of A.B.'s forensic interview at the request of the district attorney's office. She testified that Joiner had used the peer-reviewed RATAC protocol in performing A.B.'s interview. Mackey stated that the RATAC protocol allows the interviewer to make three possible findings: that the interview is consistent with abuse, that it is inconclusive, or that there are no findings of abuse.

4

¶8.     On the video, Joiner established that A.B. had referred to her vagina as her "nu-nu." Joiner asked A.B. if anyone had touched her "nu-nu" and it was not nice. A.B. responded, "Christy[4] and them," and later, "Tim and them." When asked who else had touched her "nu-nu," A.B. responded, "Johnny." Joiner then asked if someone else had touched it, and A.B. responded in the negative. Then, Joiner asked, "Who is Glenn?" A.B. had no response. Then, Joiner asked, "Tell me who all touched you. You said Tim touched you, who else?" A.B. then stated, "Johnny . . . Glenn." Joiner asked where Glenn had touched her, and A.B. said "my nu-nu." When asked where Johnny had touched her, A.B. said "nowhere." She denied that any of the men had hurt her. A.B. pointed to her vagina when asked where they had touched her, and she said her pants were down. In succession, Joiner asked A.B. whether Tim, Glenn, Johnny, her mother, or her grandmother had ever touched her nu-nu, and she responded yes to each one. When asked if Krystal knew about the touching, A.B. said yes. In response to further questioning, A.B. indicated that she had seen Tim's, Johnny's, and Glenn's penises, and that Tim and Glenn had touched her with their penises. But when asked where Tim had touched her with his penis, A.B. responded "nowhere." Using dolls representing herself and Tim, A.B. demonstrated abuse by Tim and stated that he had put his penis in her "butt." A.B. also stated that Tim had cut her in the side with a knife, and that Krystal had touched her "nu-nu" with a knife; Shaw testified that these two allegations were unsubstantiated.

¶9.     Mackey testified that, due to Joiner's departure from Family Crisis Services, she never

---

[4]Krystal Jordan was known variously as Krystal, Kristi, or Christy.

had discussed the interview with Joiner. Mackey was critical of Joiner's forensic interviewing techniques. She criticized Joiner's failure to ask follow-up questions and her use of confusing compound questions. Also, Mackey stated that Joiner's introduction of Glenn's name into the interview "was wrong" because it was suggestive. Mackey was unable to explain why A.B. was inconsistent in some of her responses. However, Mackey testified that, after viewing the interview multiple times, she concluded that A.B.'s interview was consistent with sexual abuse. Mackey also created an inexact transcript of the interview that was admitted into evidence.

*Krystal's testimony*

¶10.   Krystal testified as part of her plea agreement, under which she pleaded guilty to three counts of sexual battery and one count of felony child neglect. She received twenty years, with ten years suspended, for sexual battery, and ten years for child neglect, with all sentences to run concurrently. In anticipation of Krystal's testimony, Dr. Thomas Fowlkes testified that he had treated Krystal at the Lafayette County Detention Center. Krystal had admitted to prior drug abuse. Dr. Fowlkes testified that a court-ordered mental evaluation had concluded that Krystal was mildly mentally retarded. He stated that Krystal's mental state had deteriorated further during the three years she had been incarcerated due to her abuse of inhalants that had caused irreversible brain damage.

¶11.   Due to her mental deficiencies, Krystal had such difficulty testifying that the trial court permitted leading questions. Krystal testified that she routinely had had sex with Glenn and Johnny at Johnny's trailer in exchange for drugs. She testified that she had assisted Tim

6

in having sex with A.B. on several occasions. She testified that, before each incident, she had pacified A.B. with a Lortab pill. Krystal testified that, when Glenn and Johnny heard about this, they requested permission to have sex with A.B. Krystal related several incidents in which she had helped Glenn and Johnny have sex with A.B.

## LAW AND ANALYSIS

### I. THE ADMISSION OF A.B.'S VIDEOTAPED HEARSAY STATEMENTS

#### A. *Constitutional principles*

¶12.    The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "[I]ntroduction of evidence admitted via a hearsay exception does not necessarily foreclose Confrontation Clause scrutiny." ***Birkhead v. State***, 57 So. 3d 1223, 1233 (Miss. 2011). The Court applies de novo review to a Confrontation-Clause objection. ***Id.***

¶13.    In ***Crawford v. Washington***, 541 U.S. 36, 51, 124 S. Ct. 1354, 1363, 158 L. Ed.2d 177 (2004), the United States Supreme Court stated that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." ***Crawford*** held that the Confrontation Clause prohibits the admission of out-of-court, "testimonial" hearsay statements against a criminal defendant, unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. ***Id.*** at 68, 124 S. Ct. at 1374. "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law

7

required: unavailability and a prior opportunity for cross-examination." *Id.* The Court stated that the term "testimonial" "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68, 124 S. Ct. at 1374. The Court indicated that a statement is likely to be determined testimonial if it was made "with an eye toward" using the statement at trial. *Id.* at 56 n.7.

¶14.    In *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), the Supreme Court provided guidance for determining whether a statement is testimonial. In *Davis*, the Court was faced with the question of whether a declarant's statements in response to a law enforcement officer's questions during a 911 call were testimonial. *Id.* at 817, 126 S. Ct. at 2270-71. The Court explained that

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822, 126 S. Ct. at 2273-74. The Court found that the statements during the 911 call were nontestimonial because all circumstances objectively indicated that the primary purpose of the interrogation was to enable the police to meet an ongoing emergency. *Id.* at 828, 126 S. Ct. at 2277. The statements in *Davis* were not a "weaker substitute" for the witness's trial testimony. *Id.*

¶15.    Subsequently, the Supreme Court established that documents kept in the regular course of business ordinarily are considered nontestimonial and may be admitted pursuant

8

to applicable hearsay rules, unless the regular course of the entity's business is to compile information for trial. *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2538, 174 L. Ed. 2d 314 (2009). Additionally, statements made to health-care providers for the purpose of diagnosis or treatment generally are considered nontestimonial, as are statements made to friends and neighbors. *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2722, 180 L. Ed. 2d 610 (2011); *Giles v. California*, 554 U.S. 353, 376, 128 S. Ct. 2678, 2692-93, 171 L. Ed. 2d 488 (2008).

¶16.   The Supreme Court further clarified the distinction between testimonial and nontestimonial statements in the recent case of *Michigan v. Bryant*, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). In *Bryant*, the Court evaluated the statements a gunshot victim made to the police officers who discovered him mortally wounded in a parking lot. *Id.* at 1150. The victim had provided answers to the officers's questions of "what had happened, who had shot him, and where the shooting had occurred." *Id.* The Court articulated the following rule: "When a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Id.* at 1162. If, after employing this analysis, the court determines that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency, then the statements are nontestimonial and may be admitted pursuant to state rules of evidence. *Id.* at 1167. But if the primary purpose was "to establish or prove past events potentially relevant to later criminal prosecution," then

9

the statements are testimonial and may not be admitted unless the witness either testifies, or is deemed unavailable and there was a prior opportunity for cross-examination. *Id.* at 1157; *Crawford*, 68, 124 S. Ct. at 1374.

¶17.    The Court emphasized several important factors courts should consider in making this objective evaluation. "[T]he existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial." *Id.* at 1165. But that is simply one factor in making the determination. *Id.* at 1160. Another factor is the formality or informality of the encounter between the victim and the interrogator. *Id.* For example, questioning that occurs in a public area, in a disorganized manner, is highly informal and is more likely to be found nontestimonial than a formal station-house interrogation. *Id.* Additionally, "the statements and answers of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Id.* In fact, "[i]n many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers." *Id.* at 1160-61. "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* at 1156. The Supreme Court recognized that the primary purpose of the interrogation may be illuminated by both the interrogator's identity, and "the content and tenor of his questions." *Id.* at 1162. Although the Court articulated specific factors, it

10

clarified that courts making the "primary purpose" determination should consult all relevant information. *Id.* Applying this analysis, the Supreme Court determined that the gunshot victim's statements were nontestimonial because an objective evaluation of all relevant circumstances indicated that "'the primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency.'" *Id.* at 1167 (quoting *Davis*, 547 U.S. at 822, 126 S. Ct. at 2266).

        B. *Mississippi cases*

¶18.    This Court has held in the context of a child sexual-abuse case that "a statement is testimonial when it is given to the police or individuals working in connection with the police for the purpose of prosecuting the accused." *Hobgood v. State of Mississippi*, 926 So. 2d 847, 852 (Miss. 2006). In *Hobgood*, this Court found that the hearsay statements of a child sexual-abuse victim admitted under the tender-years exception were nontestimonial because the statements had not been made for the purposes of prosecution, but instead to seek medical and psychological treatment. *Id.* However, the Court held that statements which the child had made to investigating officers were testimonial. *Id.* In *Bishop v. State*, 982 So. 2d 371, 375 (Miss. 2008), the trial court admitted the statements of a child sexual-abuse victim to her mother and her therapist because they were not made for the purpose of furthering the prosecution, and they were nontestimonial. The trial court excluded as testimonial the child's hearsay statements to a forensic interviewer because the child had been sent to the forensic interviewer for the purpose of gathering evidence against Bishop. *Id.* This Court affirmed the trial court's determination that the child's statements to the mother and therapist were

11

nontestimonial. *Id.* Although *Hobgood* and *Bishop* were decided before *Bryant*, they applied an analysis consistent with that approved by the *Bryant* Court of "objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Bryant*, 131 S. Ct. at 1162.

### C. *Confrontation-Clause analysis*

¶19.   It is undisputed that A.B.'s statements were hearsay and that the defendants did not have a prior opportunity to cross-examine her. Therefore, the only question is whether A.B.'s statements in the forensic interview were testimonial. If an objective evaluation of all relevant circumstances indicates that the primary purpose of the forensic interview was to gather evidence to further a criminal prosecution, then the interview was testimonial.

¶20.   ˙ The State does not argue that the primary purpose of the interview was to meet an ongoing emergency, as in *Davis* and *Bryant*. Indeed, A.B. was safely in the care of her great-grandmother when she reported sexual abuse. Her grandmother contacted DHS, which began an investigation that day. Considering the question of formality, the forensic interview was highly formal. The interview occurred in a facility specially designed for that purpose. It was conducted according to the RATAC protocol, which Mackey testified is a protocol comprised of questions designed to elicit information from a child to enable the interviewer to conclude whether the interview is consistent with a conclusion that the child has been abused.

¶21.   ˙ However, the formality of an interrogation is not dispositive of whether the primary purpose of the interrogation was to gather evidence for a criminal prosecution. *Bryant*, 131

S. Ct. at 1160. I turn to "the identity of [the] interrogator, and the content and tenor of h[er] questions." *Id.* at 1162. Joiner was a trained forensic interviewer. "Forensic" has been defined as "used or suitable to courts of law." *Black's Law Dictionary* 660 (7th ed. 1999). This definition indicates that a "forensic interview" is geared toward gathering information for use in court. As Mackey testified, a forensic interview is a "fact-finding interview." Indeed, Joiner's questions focused on eliciting A.B.'s identification of her abusers. Joiner asked A.B. pointed and repeated questions in an apparent effort to determine who had abused A.B., and exactly what acts the perpetrators had committed. In furtherance of this obvious goal, Joiner introduced the name of Glenn, one of the men A.B. had named in her statements to her great-grandmother. The fact that the forensic interview was preserved on videotape and transmitted to law-enforcement officials indicates a prosecutorial purpose. Also, the fact that a separate medical examination of A.B. was performed provides further indication that the purpose of the forensic interview was to gather evidence, and not for medical diagnosis and treatment.

¶22. The Court of Appeals found that the forensic interview was nontestimonial because the interview had been administered by a nonprofit entity, Family Crisis Services, and no member of law enforcement had been involved. *Jordan*, 2010 WL 3547997, at *8. However, the lack of participation by members of law enforcement does not end the inquiry. The pertinent question is not whether law-enforcement officials were present, but whether, objectively considered, all relevant circumstances indicate that the primary purpose of the forensic interview was "to establish or prove past events potentially relevant to later criminal

prosecution." A.B.'s forensic interview was arranged by DHS as part of its investigation into the abuse allegations. In **Davis**, the Court recognized that 911 operators "may at least be agents of law enforcement when they conduct interrogations of 911 callers" and the Court "consider[ed] their acts to be acts of the police" for the purpose of its analysis. **Davis**, 547 U.S. at 823n.3, 126 S. Ct. at 2274. Shaw, the DHS employee who witnessed the interview, testified that the purpose of the forensic interview was "so that [A.B.] doesn't have to be interviewed by me and then the same question is asked by the police, and the same question is asked by the D.A.; so that we can all see it on the tape; and she won't have to be asked more than once." Shaw's testimony plainly shows that Family Crisis Services, and its employee, Joiner, were acting as agents of law enforcement in conducting a fact-finding interview of A.B. on behalf of DHS, the police, and the D.A.'s office.

¶23.    An objective evaluation of all the relevant circumstances indicates that the primary purpose of the forensic interview of A.B. was to establish or prove past events relevant to a criminal prosecution of A.B.'s alleged abusers. The forensic interview was conducted in a formal setting, using a protocol designed to elicit information about past occurrences, and preserved on videotape. Shaw's testimony established that Family Crisis Services acted as an agent of law enforcement by conducting the interview in order to gather information on behalf of DHS, the police, and the D.A.'s office. An objective evaluation of all relevant circumstances shows that the videotape of A.B.'s forensic interview was intended as a substitute for trial testimony. Because A.B.'s statements in the forensic interview were elicited "with an eye toward use at trial," I would find they constituted testimonial hearsay

and that their admission violated Tim's, Glenn's, and Johnny's right of confrontation as guaranteed by the Sixth Amendment.

### D. Harmless-error analysis

¶24.    Confrontation-Clause violations are subject to harmless-error analysis. *Bynum v. State*, 929 So. 2d 312, 314 (Miss. 2006). "A defendant convicted on the basis of constitutionally inadmissible Confrontation Clause evidence is entitled to a new trial unless it was harmless in that 'there was [no] reasonable possibility that the evidence complained of might have contributed to the conviction.'" *U.S. v. Jackson*, 636 F.3d 687, 697 (5th Cir. 2011) (quoting *United States v. Alvarado-Valdez*, 521 F.3d 337, 341 (5th Cir. 2008)); *see Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). To affirm despite a Confrontation-Clause violation, a reviewing court must find from a consideration of all the evidence that the Confrontation-Clause error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438, 89 L. Ed. 2d 674 (1986).

¶25.    The physical evidence established that A.B. had been the victim of severe sexual abuse. The prosecution bore the burden to prove beyond a reasonable doubt that the perpetrators of that abuse were Tim, Glenn, and Johnny. Portions of the forensic interview in which A.B. implicated Tim, Glenn, and Johnny were played multiple times for the jury. The interview provided the jury with its only opportunity to observe A.B. and assess her demeanor and credibility. Mackey vouched for the validity of Joiner's questioning techniques and opined that A.B.'s disclosures in the interview were consistent with those of

a child who has been sexually abused. Other than A.B.'s hearsay statements on the videotape, the only evidence establishing the identity of the perpetrators was the testimony of Krystal, and the testimony of A.B.'s grandmother, great-grandmother, and therapist. Krystal testified in exchange for a favorable plea deal and had difficulty testifying due to mental impairment. A.B.'s grandmother, great-grandmother, and therapist testified to isolated statements by A.B. in which A.B. also consistently implicated Larry. The fact that Larry never was charged in connection with A.B.'s allegations casts doubt on A.B.'s credibility.

¶26.    Without the forensic interview, the amount of highly persuasive evidence that the defendants were the perpetrators would have been considerably diminished. I would find that, considering the evidence against the defendants, the error in admitting the forensic interview was not harmless beyond a reasonable doubt, and the defendants are entitled to a new trial.

### II. THE ADMISSION OF A.B.'S MOTHER'S ATTORNEY, CARNELIA FONDREN, UNDER THE HEARSAY EXCLUSION FOR PRIOR CONSISTENT STATEMENTS

¶27.    When the defense cross-examined Krystal about her plea agreement, she became confused and had difficulty answering the questions. In an effort to rehabilitate Krystal, the State called Krystal's attorney, Carnelia Fondren, as a surprise witness to testify to prior consistent statements Krystal had made during plea negotiations.[5] Over a hearsay objection, the trial court ruled that the statements were admissible under Rule 801(d)(1)(B) to rebut the

---

[5] Krystal waived the attorney-client privilege, permitting Fondren's testimony.

charge that Krystal had fabricated her testimony in order to get a favorable plea deal.

¶28.    Fondren testified that she had spent about sixty hours with Krystal during the course

of her representation. Fondren testified that, although Krystal had maintained her innocence

for a year, Fondren had suspected that Krystal knew what had happened to A.B., and Fondren

approached the State to negotiate a plea deal for Krystal. She testified that, subsequently,

Krystal had admitted to her that she had helped each defendant sexually assault A.B., and that

based on Krystal's admissions, Fondren had believed Krystal was justified in pleading guilty.

¶29.    Rule 801(d)(1)(B) provides, in relevant part:

> A statement is not hearsay if:
>
> . . . The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . .

M.R.E. 801(d)(1)(B). In *Tome v. U.S.*, 513 U.S. 150, 156, 115 S. Ct. 696, 700, 130 L. Ed.

2d 574 (1995), the Supreme Court held that a prior consistent statement is admissible under

Rule 801(d)(1)(B) only if it was made prior to the time that the motive for fabrication arose.

This is because a statement made after a motive to fabricate arose is not relevant to rebut a

claim of recent fabrication. *Id.* This Court applied *Tome*'s holding in *Owens v. State*, 666

So. 2d 814, 816 (Miss. 1995), stating that "a prior consistent statement may not be admitted

to refute all forms of impeachment or merely to bolster the witness's credibility, but only to

rebut an alleged motive." For admissibility, "[t]he consistent statements must have been

made before an alleged influence, or motive to fabricate arose." *Id.* at 816-17 (citing *Tome*,

17

513 U.S. at 156, 115 S. Ct. at 700). Therefore, the timing of the motive to fabricate is key to the admissibility determination. *Tome*, 513 U.S. at 166, 115 S. Ct. at 705.

¶30.    The timing of Krystal's motive to fabricate is discernable from Fondren's testimony. Fondren testified that when Krystal was charged, she had denied any knowledge of who had abused A.B. Then, Fondren communicated with the prosecutor about a possible plea deal, and the prosecutor responded that he needed Krystal's assistance. About a year passed with no plea offer, during which time Krystal maintained her innocence. Then, a plea deal was negotiated in which Krystal admitted to criminal conduct. Fondren specifically testified that, at the time she requested a plea deal from the prosecutor, Krystal had not yet revealed any inculpatory information. She testified that she then had asked the prosecutor what kind of deal he could offer, assuming Krystal inculpated the defendants. Then, Krystal told Fondren that she had assisted Tim, Glenn, and Johnny in sexually assaulting A.B.

¶31.    I would find that, because Krystal's admissions to criminal conduct occurred in the course of her plea negotiations with the State, they were made after her motive to fabricate existed, and they were not relevant to rebut the charge of recent fabrication. Krystal's statements to Fondren were inadmissible under Rule 801(d)(1)(B), and their admission impermissibly bolstered Krystal's testimony.

## CONCLUSION

¶32.    



**KITCHENS, J., JOINS THIS SEPARATE WRITTEN STATEMENT.**