# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### WESTERN DIVISION

**GLENN E. GROSE,**                                             **PETITIONER**

**v.**                                              **No. 3:12CV46-MPM-DAS**

**WARDEN J.J. STREETER, ET AL.**                          **RESPONDENTS**

## MEMORANDUM OPINION

This matter comes before the court on the *pro se* petition of Glenn E. Grose for a writ of *habeas corpus* under 28 U.S.C. § 2254. The State has responded to the petition; Grose has filed a traverse, and the matter is ripe for resolution. For the reasons set forth below, the instant petition for a writ of *habeas corpus* will be denied.

### Procedural Posture

The petitioner, Glenn Grose, is lawfully in the custody of Timothy Outlaw, Warden of the Marshall County Correctional Facility in Holly Springs, Mississippi. Grose was convicted of three counts of sexual battery, under Miss. Code Ann. § 97-3-95(1)(d), and one count of felony child neglect, under Miss. Code Ann. § 97-3-39(1)(c), in the Circuit Court of Lafayette County, Mississippi. State Court Record (hereinafter "SCR"), Vol. 2, p. 206. On October 14, 2008, he was sentenced as a habitual offender, under Miss. Code Ann. § 99-19-81, to serve life imprisonment for each of the sexual battery convictions and ten years for felony child neglect in the custody of the Mississippi Department of Corrections, with the sentences running consecutively. SCR, Vol. 2, pp. 206-207.

Grose filed an appeal of his convictions and sentences in the Mississippi Supreme Court, raising the following issues (as stated by counsel):

    I.     The Trial Court erred by allowing into evidence the forensic interview of B.J. because the interview did not have sufficient indicia of reliability and the interview's admission violated *Crawford v. Washington*.

II.     The Trial Court erred by not allowing the defense to cross-examine the state's witness Gloria Beccerill about her pending drug charge in Pontotoc County, violating his sixth amendment rights to cross examination and contrary to *Giglio* and *Napue* as well as *Miss. R. Evid. 616*.

III.    The Trial Court erred when it did not grant a mistrial regarding testimony of Carnelia Fondren.

IV.     The Trial Court erred when it allowed the state to amend the indictment to add substantive changes and this error violated Mr. Grose's sixth amendment rights.

V.      There was insufficient evidence to convict Glen Grose and as such his case should be reversed and rendered, additionally the verdict was against the overwhelming weight of the evidence and the trial court erred by not granting a new trial.

On September 14, 2010, the Mississippi Court of Appeals affirmed the judgment of the Circuit Court.

*Jordan, Grose, and Grose v. State,* 80 So.3d 817 (Miss.Ct.App. 2010) *reh'g denied* June 7, 2011, *cert. granted* Sept. 8, 2011, *cert. dismissed* Feb. 16, 2012 (Cause No. 2008–KA–01761–COA).   Glenn Grose did not seek state post-conviction collateral review under Miss. Code Ann. § 99-39-1, *et seq.*

In the present petition for a writ of *habeas corpus*, filed on May 16, 2012, Grose raises the following issues *pro se*:

Ground One.      Whether the state court's decision on the tender years exception claim involved an unreasonable application of federal law.

Ground Two.      The trial court erred by finding that the interview statements of (AB) contained sufficient indicia of reliability.

Ground Three.    Whether Carnelia Fondren's testimony should have been excluded for bolstering testimony of Krystal Jordan.

Ground Four.     Whether there was constitutional trial error that had a substantial and injurious effect on jury's verdict.

Ground Five.     Whether petitioner should be awarded an evidentiary hearing.

On April 22, 2013, the State moved under 28 U.S.C. § 2254 (b) and (c) to dismiss the instant petition for failure to exhaust state remedies. ECF, Doc. 7. The claim raised in ground four had not been presented to the state's highest court in a procedurally proper manner. On May 20, 2013, Grose sought to amend his petition and remove Ground Four. ECF, Doc. 12. On August 5, 2013, the court adopted the Magistrate Judge's Report and Recommendations, granted the Grose's Motion to Amend, and, on August, 7, 2013, ordered Respondents to answer only the remaining exhausted grounds. ECF, Doc. 14 and 15. Grose filed a Traverse in support of his petition on September 27, 2013, and an exhibit to the petition on March 26, 2015. The matter is now ripe for review.

## Facts[1]

In October 2005, Rhiannon Shaw was employed by the Lafayette County Department of Human Services as a family protection specialist and charged with investigating reports of child abuse, neglect and exploitation. She also maintained "case loads with cases on families or foster children." On October 20, 2005, Ms. Shaw received "an anonymous phone report from someone stating that child abuse and neglect were occurring at the home of Krystal and Tim Jordan."[2] The

---

[1] The court has taken the facts in this case largely from the State's response to the instant petition for a writ of *habeas corpus*. The facts are documented in the state court record in this case, which is not in dispute.

Further, after deliberation, the court has decided to include in the facts the vulgar sexual language used by the defendants, the witnesses, and, indeed, the three-year-old victim in this case. The crude and casual way the defendants, their families, and their friends conversed about sexual topics both in and out of court and in front of small children gives a clearer view of the dysfunctional environment this very young victim experienced – and does so in a way that sugarcoating the language with scientific words or euphemisms cannot. In this instance, using civil language in the court must give way to shining the light of truth unflinchingly upon the vile and disturbing abuse this child suffered.

[2] Krystal and Timothy Jordan share a surname, as do Glenn Grose and Johnny Grose. In addition, Krystal's grandmother, Martha, is married to another member of the Grose family. Finally, Krystal's mother, Gloria Becerril, is named in the record as both "Gloria Hollis" and "Gloria Becerril," as she had recently married Sesser Becerrill. For these reasons, unless it is quoting from the record, the court will refer to these individuals by their first names to minimize confusion. At various time

caller reported that Krystal and Tim Jordan had moved into the residence of Johnny Grose and Glenn Grose, that the Jordans were abusing illegal drugs and alcohol, and that Krystal was prostituting herself for drugs. SCR, pp. 393-95.

Acting on this information, Ms. Shaw went to the Grose residence at County Road 250. When she pulled into the driveway, she saw a house in front of a trailer. When she walked to the trailer, she observed a small child on the porch. After the child ran inside, a woman, who introduced herself as Krystal Jordan, came to the door. Ms. Shaw advised Krystal of the nature of the reports and asked to speak with her privately. As the door opened, Ms. Shaw saw a wheelchair-bound man who identified himself as Johnny Grose. She also observed that the house was untidy and that it smelled of alcohol. A large bottle of whiskey, half-empty, was on the counter. A baby, the younger sister of the victim, was asleep in a swing. Krystal "denied all the allegations in the report." SCR, pp. 395-96.

Ms. Shaw then tried to interview the older child, B.J., who was dirty and barefooted, with unwashed hair. She was also hyperactive, "picking things up and kicking things." SCR, pp. 397-99. B.J. told Ms. Shaw that her mother and father smoked "dope" which they rolled themselves. *Id.* Shortly afterward, at about 3:00 p.m., Glenn and Tim arrived. Tim, too, denied the allegations in the report. When Ms. Shaw persisted, asking whether they could "pass a drug test," both men "admitted that they would probably test positive for marijuana, but that was all." *Id.*

Ms. Shaw later received "an additional report" that, on the night of October 25, Krystal physically attacked Tim in the presence of the children; that Krystal had been arrested on a domestic violence charge; and that "the children were taken to the grandparent's home." SCR, pp. 400-02. A

---

throughout the record, Mrs. Jordan is referred to as "Cristal," "Kristi," and "Christy." The court will refer to her as "Krystal" unless quoting from the record. The court will refer to the child victim of these sex offenses as B.J. and her younger sister as S.J.

day later, when she went to the paternal grandparents' residence to investigate this report, she saw B.J. "squatting in the front yard with her pants down. She appeared to be defecating in the front yard." *Id.* A woman who identified herself as Danielle Fortner, Tim's niece, "came running down the hill yelling at [B.J.] to stop." *Id.* She then apologized to Ms. Shaw and explained that she "was helping Tim's parents babysit [B.J.] because she was hard to handle." *Id.* She also stated that B.J. had a habit of defecating in the yard. Ms. Fortner told Ms. Shaw that she had observed the incident of domestic abuse. She reported that Krystal and Tim had been "yelling back and forth . . . fighting about smoking crack and using drugs," and that Krystal told Tim that Glenn had fathered S.J., the victim's younger sister. SCR, pp. 402-03.

Krystal's mother Gloria later told Ms. Shaw that she was having her daughter committed "to alcohol and drug treatment at Whitfield" and that she (Gloria) "already had" S.J. and was "going to pick up" B.J. as well. SCR, pp. 402-03. On October 31, Gloria telephoned Ms. Shaw to report that B.J. "was having problems with potty training; that her bottom was very raw; and she was [making] specific comments about people touching her and had named specific names such [as] her father, Glenn and Johnny Grose." *Id.* Ms. Shaw "told her not to question her anymore about it" and informed her that she would set up a forensic interview.[3] *Id.*

Ms. Shaw witnessed this interview, which was conducted by Ejeera Selma Joiner. Ms. Shaw sat behind a one-way mirror, which allowed her to watch the interview but kept her concealed from B.J. During the interview, B.J. stated that it was "okay" to touch male and female bodies "everywhere . . . except for the nu-nu [vagina]." SCR, pp. 405-10. She then reported first that "Christy" had touched her nu-nu [vagina]; later she said "Christy and them," and finally "she said Tim and them."

---

[3] That interview was conducted on November 3, 2005. SCR, p. 453. The DVD of the forensic interview was introduced into evidence and played for the jury. SCR, p. 406.

*Id.* She went on to say that "Tim had touched her nu-nu; that Tim had hurt her; that she had seen Tim's boardy/dick; that Tim had touched her with her [his] dick in her nu-nu; and that Tim had sat on her." *Id.* Ms. Shaw recounted additionally that B.J. stated Glenn "had touched her nu-nu; that she had seen Glenn while her pants were down; that she had seen his boardy/dick; and later on that his dick touched her." *Id.* Ms. Shaw then related that B.J. said that "Johnny had touched her nu-nu with her pants down; that she had seen his boardy/dick, that it had touched her; and that it had touched her nu-nu." *Id.* Finally, Ms. Shaw testified that on the two occasions she had observed B.J. before she was picked up by Gloria, B. J. had been dirty. She was also obese. She had "several of her bottom teeth capped" because "they were rotting," apparently from excess consumption of sugar. SCR, pp. 410-15.

Tomiko Mackey, a clinical social worker, was accepted by the court as an expert in the field of forensic examination. SCR, p. 446. Mrs. Mackey testified that she had observed the DVD of the forensic interview and had made a "provisional transcript" of it. SCR, p. 449. Mrs. Mackey pointed out that "there is no perfect interview" and testified that she had some concerns with B.J.'s forensic interview. SCR, pp. 454-57. She concluded: "In this case the issues that I saw in the interview were primarily with the interviewer. I saw few issues with the child." *Id.* She noted that after B.J. said three times that "Christy and them" had touched her, the interviewer did not ask the follow-up question, "What did Christy and them do?" *Id.* Mrs. Mackey also observed that while the interviewer had "followed the protocol, there were some techniques that were problematic." *Id.* Specifically, Ms. Joiner had asked a series of questions without allowing B.J. a chance to respond to them individually. Nonetheless, Mrs. Mackey had observed that B.J. had been "pretty consistent in what she disclosed in terms of her vaginal area being touched by a penis or someone looking at her vaginal area." *Id.* B.J. had been "fairly consistent in providing that disclosure in spite of the issues with the interviewer." *Id.*

Finally, when she was asked to give her conclusion about B.J.'s disclosure, Mrs. Mackey testified:

> Based on what [B.J.] disclosed, in spite of the issues that I had with the interviewer, [B.J.] did say that– and she said multiple times – Glenn, Tim, and Johnny touched her nu-nu. [B.J.] said that, she was able to give the information about when her nu-nu was touched. She gave information about seeing their penis. She gave information about their seeing her nu-nu. She specifically said that Glenn touched her vaginal area with his penis, and she specifically said that Tim touched her vaginal area with his penis. Based on her disclosure, and in spite of the issues I had with the interviewer, I believe [B.J.'s] disclosure is consistent with a child who has been sexually abused.

SCR, p. 473. On redirect examination, Mrs. Mackey maintained that while "[t]here are issues with her [Ms. Joiner's] technique," Ms. Joiner had "followed the protocol," and B.J.'s disclosure was that "Glenn touched her nu-nu, Tim touched her nu-nu, Johnny touched her nu-nu." SCR, pp. 492-93.

Martha Hester Grose, Krystal's maternal grandmother, testified that she had allowed Krystal and Tim to use her car, which was not running at the time. Krystal and time had told her that they would have it repaired, but did not. On October 30, after "Christy wound up in jail," Martha and her husband, Larry Grose, went to get the car. SCR, pp. 498-99. When they arrived, B.J. "got in the car" with Mr. and Mrs. Grose, "grabbed a hold of [the] steering wheel, and she wouldn't let go." *Id.* She "said she was going home" with them; Tim said, "Go ahead and take her if you want to, and I'll get her some clothes." *Id.*

Martha and Larry then took B.J. to the motel room in Bruce, their home at the time. At one point, B.J. "had to use the bathroom; and when she did, she cried. She said, Mammaw, it hurts me so bad when I pee pee." SCR, pp. 499-500. Shortly afterward, after Martha drew a bath for the child, B.J. got into the tub "and sat down, and she cried again. She said it hurt her so bad. That water hurt her so bad when she sat down in it." *Id.* Martha asked whether someone had "hurt" her "down there," and B.J. answered, "Yes, Mammaw, Tim and Christy and Johnny and Glen." *Id.* Martha "just turned and went out the bathroom and sat down on the side of the bed and . . . cried." *Id.* The next

day, Mr. Grose drove his wife and B.J. to the residence of Martha's daughter, Gloria, and told her what B.J. had said. "[A]s soon as the DHS opened up that morning," Gloria "called them; and that got everything started right there." *Id*. On redirect examination, Martha testified that on the day she was taken to the motel room, B.J. named "Christy, Tim, Johnny, and Glenn," and no one else, as the perpetrators. SCR, p. 513.

Dr. Thomas Fowlkes, a physician accepted by the court as an expert in the field of medicine, testified that he first treated Krystal in October 2005 when she was incarcerated in the Lafayette County Detention Center. Krystal told Dr. Fowlkes that she had been "abusing cocaine, marijuana, and Lortabs," a narcotic prescribed for pain relief. SCR, pp. 516-23. A few days after Dr. Fowlkes performed his initial evaluation of Krystal, she was transported to the State Hospital for alcohol and drug treatment. When she returned in January 2006, she threatened to kill herself and was placed on suicide watch. Dr. Fowlkes "put her on an antidepressant similar to what she had been on in Whitfield." *Id*. After she remained in the isolation cell "for a good period of time," she "stopped complaining about wanting to commit suicide," but she "was just more agitated and was acting out in a variety of ways." *Id*. After "another week or two" Dr. Fowlkes prescribed Haldol, an anti-psychotic medication which ultimately had the desired calming effect on Krystal. *Id*. At the time of trial, she was still taking "only a small dose" of Haldol "at nighttime." *Id*. Dr. Fowlkes believed that it would have no effect on her mental capacity during the day, and would not prevent her from being alert enough to testify. SCR, p. 526. He concluded that Krystal was mildly mentally retarded and that she had "some organic brain syndrome, or . . . some additional brain damage that makes her even less able to function now than she was three years ago." *Id*. He believed some of this deterioration had been caused by Krystal's abuse of inhalants, or "huffing." SCR, p. 524.

Krystal testified that, after she was married to Tim, and while she was living in the Lafayette Springs community, she routinely took Lortab, drank alcohol, and abused crystal methamphetamine and crack cocaine. She also had sex from time to time with Glenn and Johnny, both at the Grose trailer and at the house she shared with Tim. On these occasions she would obtain drugs from them. Tim knew about this arrangement and was "mad" about it. SCR, pp. 539-44. He bought drugs from Johnny and Glenn. There was talk that S.J. might be Glenn's child. *Id.* Shortly before S.J. was born, Krystal was, of course, "big," and her physical condition prompted Tim to suggest that he instead have sex with B.J., who was three years old at the time. SCR, pp. 546-47. Krystal agreed, and the three of them got into the shower together. According to Krystal, "He started fucking her. I had to hold her up." *Id.* She elaborated that he "fucked" her with his "dick" in her "pussy" while the baby was "[s]creaming and crying." *Id.* Krystal later wiped Tim's ejaculate off B.J.'s "belly." *Id.* A similar incident took place later in Tim and Krystal's bedroom, but this time they gave the child Lortab and "[w]aited about an hour for her to calm down." *Id.* Then, again, Tim "stuck his dick in her pussy" and ejaculated on "her belly." *Id.* These violations caused pain and irritation, which Krystal treated with antibiotic ointment. Tim penetrated B.J. a "couple" of times again before S.J. was born and the family moved to the Grose trailer. All four of them (Krystal, Tim, B.J. and S.J.) slept in the back bedroom. SCR, pp. 548-51.

Krystal also testified that Johnny and Glenn continued to provide her with drugs, and Tim continued to purchase and use them. When Krystal and Tim told Glenn what Tim had been doing to B.J., Glenn said that he "wanted to do the same thing." SCR, pp. 551-56. On one occasion, Krystal took B.J.'s clothes off and put her in the bed with Tim and Glenn, both of whom were naked. Krystal removed her own clothes and joined them in the bed. At that point Glenn "started fucking" B.J., *i.e.*,

putting his "dick" in her "pussy." *Id.* Tim also "penetrated her with his dick." *Id.* Afterward, Krystal "had to wipe the come off her belly." *Id.* Johnny told Krystal that he wanted to have sex with B.J. as well. Krystal agreed and gave the child a Lortab. After the drug took effect, she took B.J.'s clothes off, took Johnny's clothes off, and put her on top of him while he was on his back on a bed.[4] Johnny "started fucking" her, *i.e.,* with his "dick" in "her pussy." SCR, pp. 556-59. While he was performing this act, Krystal went outside and "smoked" with Glenn and Tim. *Id.* When she went back inside, she again wiped the "come" off the child's "belly." *Id.*

Krystal went on to testify that Glenn "fucked" B.J. three or four times in "the back bedroom." SCR, pp. 560-62. On two occasions, she was present and participated in the same way as before. On other occasions, Glenn would be alone with B.J. while Krystal was outside smoking, and upon her return she would find "come" on B.J.'s belly. *Id.* Krystal also testified that she performed a "blow job" on Johnny to show B.J. how to do it. Afterward, imitating her mother, B.J. performed the same act on Johnny. SCR, pp. 562-68.

Pammie Davidson, a licensed social worker, was employed as the victim's assistance coordinator for the district attorney's office. She met with Krystal "[t]en to 15 times" between October 2007 and September 2008. SCR, p. 650. When she was asked what statements Krystal had made about Tim, Ms. Davidson testified as follows:

> Krystal stated to me that the first time that Tim had sex with [B.J.] that she was still pregnant with [S.J.]; that it happened in her and Tim's home in the bathroom; that she removed [B.J.'s] clothes; and Tim removed his clothes. They went in there, and she sat [B.J.] down on top of Tim, and he had sex with her.
>
> . . .
>
> She said after he ejaculated, she would clean it up off of [B.J.'s] stomach. She also said that there were numerous other occasions when Tim would have sex with her in

---

[4] Glenn and Tim were "outside smoking" at the time. SCR, p. 557.

the bedroom of their home. He would ejaculate on her stomach, and Krystal would clean the come up off [B.J.'s] stomach. She said [B.J.] would scream and holler the first time Tim had sex with her, cried, Mommy, help me, several times.

SCR, p. 654. Ms. Davidson testified additionally that Krystal told her "they obtained Lortab to give

[B.J.] to calm her down so should wouldn't scream when Tim was having sex with her." SCR, p. 654.

When she was asked what Krystal had told her about Glenn and B.J., Ms. Davidson gave this

testimony:

> According to Mrs. Jordan, Glenn had sex with [B.J.] in the home of Johnny Grose in the back bedroom where she was keeping [S.J.'s] baby bed. This was by the time she had given birth to [S.J.] and moved over to the home of Johnny; and that he had sex with [B.J.] in the back bedroom on the bed where she was sleeping at night. She said she removed [B.J.'s] clothes, and that Mr. Glenn Grose would have sex with her in her vaginal area.
>
> . . .
>
> She stated on one occasion that they were in the home of Johnny Grose when Glenn was there; and that Tim and Glenn both was in the back bedroom with [B.J.] having sex with her and giving her Lortabs to keep her from screaming at that time too.
>
> . . .
>
> She said each time these men would have sex with [B.J.] that she would clean the come off of [B.J.], and at times would put ointment on [B.J.]. She would be raw and irritated.

SCR, p. 655.

> Finally, Ms. Davidson gave this testimony about Krystal's statements about Johnny:
>
> She stated Johnny Grose was the last one to have sex after Glenn and Tim; that he was the last male to have sex with her. She stated that Johnny was in a wheelchair; so she had to remove Johnny's clothes and well as [B.J.'s] clothes; that she would set [B.J.] on top of Johnny to have sex; and she explained to me the way she knew Johnny could have sex was she had been having sex with Johnny prior to letting [B.J.].

SCR, pp. 655-56. When the prosecutor inquired how many times these events occurred, Ms.

Davidson answered, "Several times she could remember at least five times. Five times it happened in

front of her and Tim.  She said Johnny had sex with [B.J.] the least amount of times of all of them."
SCR, p. 656.  Krystal also told Ms. Davidson "that she showed [B.J.] how to give a blow job; and she
took [B.J.] and they were in the same room together; and after she showed [B.J.] how to do it, she
closed [B.J.'s] mouth on Mr. Johnny's penis."  *Id.*

Dr. Tanya King, a pediatrician practicing in Oxford, was accepted by the court as an expert in
the field of pediatric medicine.  Dr. King testified that she first examined B.J. on November 3, 2005.
SCR, pp.711-14.  She obtained a medical history from Ms. Shaw and Gloria, but B.J. was too
"[u]ncooperative" to give a statement.  *Id.*  Dr. King then performed a "head to toe" examination on
B.J., during which the child was "very anxious."  *Id.*  Dr. King found inflammation in the child's
genital area and well as bruising on both sides of the opening of her vagina.  She elaborated that she
had discovered "deep bruising, . . . deeper than the labia majora."  *Id.*  While B.J.'s hymen was not
torn, Dr. King that "if she had any hymenal tears or tearing that . . . would have been healed."  *Id.*  She
also explained that a young girl's hymen is "somewhat protected just by the anatomy of the female
because it is more recessed once they hit puberty."  SCR, pp. 718-22.  Dr. King went on to testify that
"more than 85 percent of the time, there are no physical findings on children who have been [sexually]
abused."  *Id.*  It was Dr. King's "understanding" that, because a very young girl's vagina is so small,
perpetrators "often get only the corona or the very tip of the penis in and then ejaculate on the
abdomen or another spot."  *Id.*  Judging from B.J.'s demeanor and the bruising, Dr. King surmised that
the last instance of abuse had occurred from three days to a week before the examination.  SCR, pp.
718-27.

Dr. King then testified that B.J.'s "anus was dilated which comes after many, many times of
being penetrated by some object."  SCR, pp.723, 728.  This condition was "not normal, not even

normal for a child who would have chronic constipation." *Id*. Dr. King was certain that the injury had

been caused by "repeated penetration by an object" at least two inches wide, occurring over a period

of "[m]onths." *Id*. Dr. King had performed between 200 and 300 examinations on victims of child

sexual abuse, but she had never seen another child with an anus so damaged. *Id*. In response to

questions asked during cross-examination, the prosecutor asked Dr. King on redirect examination

whether the inflammation could have been caused by diaper rash. She responded, "Considering with

all the other findings, I think it definitely was healing from her sexual abuse." SCR, pp. 743-44. She

also testified that to a reasonable medical certainty, her opinion was that the bruising inside the labia

majora was caused by "penetration by an object, whether it be, you know, a penis or whatever." *Id*.

Gloria (Krystal's mother) testified at trial that during 2005, she "didn't visit" Tim and Krystal

"a whole lot" because she did not approve of their excessive drinking and drug abuse. SCR, pp. 746-

50. She had seen Tim smoking marijuana, and "on one occasion they had a party" at Tim and

Krystal's trailer "and they were passing something around on foil." *Id*. Later that year, she visited

Tim and Krystal "at Johnny Grose's trailer." *Id*. Krystal's pre-adolescent son Justin, from a previous

marriage, was present, along with Gloria's mother, B.J. and S.J., who was born in May 2005. Gloria

was "not sure," but she thought Glenn "was in the house" too.[5] *Id*. According to her, "the baby was in

the back bedroom of the trailer on the bed, and [B.J.] and Justin was just running loose everywhere.

They was all in the yard." *Id*. Gloria described the children as "nasty and dirty," B.J. "would have on

just a shirt and her hair never looked like it had ever been combed. *Id.* Her panties were wet and

nasty and a lot of times there would be poop running down her legs." *Id*. She did not see Tim or

Krystal prepare meals for the children; rather, Martha did so.

---

[5]Gloria previously had a sexual relationship with Glenn Grose, but she ended it after about a
month because she "didn't like all the drugs and the alcohol." SCR, p. 749.

On October 31, Gloria learned from Martha "that Tim and Kristi had been fighting and Kristi ended up in jail." SCR, pp. 751-54. Gloria and Martha then went to the residence of Tim's parents to "check on the kids." *Id.* According to an agreement, Gloria took S.J. while the paternal grandparents kept B.J. A few days later, Martha brought B.J. to Gloria's house and told her that B.J. had complained of pain during urination.[6]   Upon examining B.J.'s vaginal area, Gloria saw that it was "red and raw." *Id.*   B.J. then told her "that Kristi and Tim and Glen and Johnny had hurt her." *Id.*   She told her grandmother "that they had hurt her with their fingers and Tim had hurt her with his dick." *Id.*[7]   On several subsequent occasions, Gloria asked B.J. who had hurt her, and the child always named "Kristi and Tim and Glen and Johnny." *Id.*[8]   B.J. also told Gloria that she, Tim and Kristi had taken showers together, that she (B.J.) "had sucked Tim's dick,"[9] and that Johnny and Glenn had "hurt her down there" with their fingers. *Id.*   In the beginning of B.J.'s stay with Gloria, B.J. tried to nurture her little sister, but eventually she began displaying hostility toward her.  She hit the baby in the stomach, bent her fingers backward, and said that she wanted to put S.J. "in a garbage bag and smother her." SCR, p. 755.  B.J. also began acting inappropriately in other ways.  She once took a frankfurter out of a bun and simulated fellatio on it.  She ate her own feces and smeared it on herself, her clothes, and other things.  She masturbated in the presence of the meter reader.  SCR, p. 761-62.

Robin Smith, a clinical social worker with an emphasis on physically and sexually abused children, was accepted by the court as an expert in this field.  SCR, p. 802.  Ms. Smith began seeing

---

[6]Gloria testified that B.J. had been with Martha for approximately two days.  SCR, pp.753.

[7] At that point, Gloria notified DHS, as Martha testified.

[8] "A little later," B.J. named Larry Grose as a perpetrator.  SCR, p. 754.

[9] Gloria testified that she never had used such language in B.J.'s presence.  SCR, p. 754.

B.J. shortly after she turned four, when she was in Gloria's custody. Gloria had reported that B.J. was angry, destructive, violent, defiant, hyperactive, disobedient, totally lacking in social skills and unable to focus. She was cruel and threatening to her little sister; and she was cruel to the family dog. Desperate for attention, B.J. routinely behaved provocatively with men, even strangers. She would try to sit on their laps and rub their crotches. In Ms. Smith's words, B.J. "had no boundaries." SCR, pp. 804-08. She illustrated this point with the following testimony:

> [B.J.] was very likely to walk up to somebody and say, Do you want to touch my pussy or I want you to touch my pussy, or walk up to somebody and say, I want to touch your dick. I mean, that was just as likely as her to walk up to you and say, Hi. Those were the things she did.

> She walked in my office the first day and I asked her where her mother was because she had been removed from her mother and she proceeded to tell me who all was in jail and I asked her why they were in jail. She spread her legs wide apart and she said, they touched me here in my pussy, and then she turned around and showed me they had touched her in her rectum too.

> . . .

> The masturbating, and we still have a problem with that. She would masturbate at school, at home, in front of people. It didn't matter. She would grab women's breasts. In fact, she's tried to grab mine. She would be very promiscuous and provocative for a four-year-old.

SCR, pp. 808-09.

Ms. Smith testified further that B.J. had touched other children inappropriately when she was at Head Start and when she was in treatment at Alliance. She had a habit of staring at people. She routinely stared at her step-grandfather while he was eating dinner. When he asked her why, she said that she wanted him to touch her. SCR, pp. 809-12. Regarding B.J.'s eating and smearing of her feces, Ms. Smith testified that she had "never seen a child do it that wasn't sexually abused." SCR, pp. 812-14. Asked about her behavior toward S.J., Ms. Smith answered, "She hated her little sister. . . .

[S]he would tell you she hated her little sister. She was mean to her." *Id*. B.J. also told Ms. Smith that

she "wanted to cut them [S.J. and Gloria] up in little pieces and put them in a plastic bag." *Id*. All of

these behaviors led Ms. Smith to diagnose B.J. "with post-traumatic stress syndrome, and that's

because of the abuse." SCR, pp. 814-16. She also had both the inattentive and hyperactive types

Attention Deficit Hyperactive Disorder (ADHD) and reactive attachment disorder. She "had no

attachment to anybody." *Id.* She also suffered trichotillomania, manifested by the obsessive pulling

of "hunks of hair out of her head." *Id*. During play therapy, Ms. Smith discovered that B.J. "didn't

know how to play. She had no concept of playing." SCR, p. 829.

After Gloria reported that B.J. had been eating and smearing her own excrement, Ms. Smith

"started exploring this" with the child. SCR, pp. 830-31. B.J. blurted out, "Kristi has a pussy." *Id.*

When Ms. Smith asked, "Do you want to tell me more about that?" *Id.* B.J. answered "Glen likes to

play with her pussy. Glen likes to play with Kristi's pussy. It's always Kristi and Tim. It's never

mother and daddy." *Id*. Ms. Smith went on to testify, "She has repeatedly told me that the people that

touched her in her pussy were Kristi, Tim, Glen, Johnny, and Larry. She told me that in the beginning.

She told me that just a few weeks ago." *Id*. On one occasion during therapy, B.J. tried to grab Mrs.

Smith's breasts and screamed, "I hate Tim and Kristi." SCR, pp. 835-36. When she was asked why,

she "pointed to her vaginal area again and said that Tim, Kristi, Glen, and Johnny had touched her

there, and Larry also." *Id*. She repeatedly denied that her half-brother Justin had molested her. *Id*.

Over the next two years, B.J. was admitted to two different residential facilities for psychiatric

treatment. Commitment to a psychiatric institution is virtually unheard-of for a child so young. SCR,

pp. 836-46. B.J. continued to display bizarre behaviors; it appeared that she was experiencing

flashbacks. She tried to touch her little sister's genitals. *Id*. Asked about B.J.'s prognosis, Ms. Smith

testified that she had a "grave concern" that the child would turn to substance abuse, that she would be promiscuous, that she would be an easy target for abuse, that she would become psychotic, or that she would mutilate or kill herself. SCR, pp. 847-49.

Carnelia Fondren was Krystal Jordan's attorney. She testified at trial over the defense's objection. SCR, pp. 661-697. Fondren testified about the details and parameters of Krystal's plea agreement and that she had spoken with Krystal extensively about her involvement in the sexual battery and child neglect crimes. Krystal told Fondren that she had helped Tim, Glenn, and Johnny sexually assault her daughter. Fondren believed Krystal was justified in pleading guilty to the charges after her discussions. Fondren approached the State to negotiate a plea deal for Krystal, and the State offered to recommend that Krystal serve a total of twenty years with ten years suspended in exchange for her cooperation in this case. SCR, p. 668. The defense moved for a mistrial at the conclusion of Fondren's testimony. SCR, p. 697. They alleged her testimony was improper opinion testimony and prejudicial to the defendants. The trial court denied the motion and held that the defense opened the door to Fondren's testimony by implying that Krystal's plea deal was obtained by fraud. Further, the trial court explained that this made the testimony relevant and admissible as to whether there was a legitimate basis for Krystal's guilty plea. SCR p. 700.

At trial, Tim Jordan testified that he was drinking and doing drugs while he was married to Krystal and around the children. He stated that the only time he "touched" B.J. "down there" was when he "was giving her a bath or having to wipe her tail or something like that when she had to go to the bathroom." SCR, pp. 1002-03. He also said he "would never think" that Glenn or Johnny "would do something like that" – sexually abuse B.J. *Id*. However, he also testified that he, Krystal, and Glenn Grose engaged in three-way sex in the back bedroom of Johnny's house – and did so while B.J.

and S.J. were on a pallet right beside the bed. He testified, "I had sex with Kristi first, and then Glen had sex with her." SCR, p. 1015. He also told the jury that B.J. was "[o]n a pallet on the floor in the same bedroom at the time.

Glenn Grose took the stand and admitted a lifelong history of drug and alcohol abuse, including alcohol, crack cocaine, and marijuana use during the times relevant to this case. SCR, pp. 1096-98. He denied having given Krystal drugs in exchange for sex; rather, he said, "she was always wanting to have sex with me." SCR, p.1108. He did, however, testify that he Krystal, and Tim had sex together with the two young girls in the room just next to the bed. He said, "[Krystal] was giving me a blow job when [Tim] was screwing her." SCR, p. 1106. Glenn stated that while he, Tim, and Krystal were having a "threesome," "BJ was on the floor," and "[S.J.] was in the baby bed" right next to them. SCR, p. 1134-1135. Though Glenn denied having "messed with BJ in a sexual way," SCR, p.1119, he admitted that Krystal had offered to make B.J. available for his sexual needs. SCR, p. 1112-1113. Krystal was pregnant; they were flirting on Johnny's porch, and "[Glenn] was asking her for some [sex] . . . and she bumped [him] . . . and she pointed at BJ." *Id.* Glenn understood Krystal to be offering her three-year-old daughter for him to have sex with him, and he suspected then that B.J. might have been sexually abused by other men. SCR., p. 1113. He testified that he declined her offer. *Id.*

Johnny Grose testified that he routinely gave Krystal money, purportedly to be used to buy milk and diapers for the children. He was prescribed Lortab, and he gave a few to Krystal, who lived in his trailer for a time. SCR, p. 1232. He and Krystal regularly had sex, SCR, p. 1252. One time, he and Glenn alternated having sex with Krystal; one would watch the children, while the other would have sex with Krystal in the back bedroom of Johnny's trailer. SCR. p. 1236. The two young girls,

B.J. and S.J., slept in the back bedroom on a "floor mat." SCR, p. 1231-1232. Johnny was aware that

Glenn, Tim, and Krystal were engaging in three-way sex in the back bedroom of his trailer. SCR, p.

1242. He denied having had sexual contact with B.J. SCR, pp. 1244-45.

### Grounds One, Two, and Three:
### Decided on the Merits in State Court

The Mississippi Supreme Court has already considered Grounds One, Two, and Three on

the merits and decided those issues against the petitioner; hence, these claims are barred from

*habeas* review by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d),

unless they meet one of its two exceptions:

> (d) An application for a writ of *habeas corpus* on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings *unless* the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in
>> the State court proceeding.

*Id.* (emphasis added). The first exception, subsection (d)(1), applies to questions of law. *Morris*

*v. Cain*, 186 F.3d 581 (5th Cir. 2000). The second exception, subsection (d)(2), applies to

questions of fact. *Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir. 1997). Since the petitioner's

claims challenge both the application of law and the finding of fact, this court must consider the

exceptions in both subsections.

Under subsection (d)(1), a petitioner's claim merits *habeas* review if its prior

adjudication "resulted in a decision that was *contrary to*, or involved an *unreasonable*

*application* of, clearly established Federal law." *Id.* (emphasis added). A state court's decision is *contrary to* federal law if it arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law, or if it decides a case differently from the Supreme Court on a set of "materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523 (2000). A state court's decision involves an *unreasonable application of* federal law if it identifies the correct governing principle but unreasonably (not just incorrectly) applies that principle to facts of the prisoner's case; this application of law to facts must be *objectively* unreasonable. *Id.* at 1521. As discussed below, the petitioner has not shown that the Mississippi Supreme Court unreasonably applied the law to the facts, or that the court's decision contradicted federal law. Accordingly, the exception in subsection (d)(1) does not apply to Grounds One, Two, and Three of the petitioner's claim.

Nevertheless, under § 2254(d)(2) these grounds may still merit review if those facts to which the supreme court applied the law were determined unreasonably in light of the evidence presented. Because the supreme court is presumed to have determined the facts reasonably, it is the petitioner's burden to prove otherwise, and he must do so with clear and convincing evidence. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000); 28 U.S.C. § 2254(e)(1). As discussed below, the petitioner has failed to meet this burden; as such, he cannot use subsection (d)(2) to move these claims beyond § 2254(d), which bars from *habeas corpus* review issues already decided on the merits.

### Grounds One and Two:  Confrontation Clause

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI., cl. 2. Thus, the Sixth Amendment

guarantees a defendant's right to confront witnesses who "bear testimony" against him. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S.Ct. 1354 (2004). The right has its origins in the English Common Law, *King v. Paine,* 5 Mod. 163, 87 Eng. Rep. 584 (1696). The Confrontation Clause applies only to statements offered to prove the truth of the matter asserted. *Williams v. Illinois*, ⎯ U.S. ⎯, 132 S.Ct. 2221, 2228 (2012) (plurality opinion), *Crawford*, 541 U.S. at 59, n. 9. A witness' testimony against a defendant is thus inadmissible "unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527 (2009) (citing *Crawford*, 541 U.S. at 54). Under the Confrontation Clause, a defendant is not even required to seek the attendance and testimony of witnesses offering evidence against him; instead, the prosecution has an affirmative duty to call each witness, elicit testimony, and present the witness for cross-examination:

> Converting the prosecution's duty under the Confrontation Clause into the defendant's privilege under state law or the Compulsory Process Clause shifts the consequences of adverse-witness no-shows from the State to the accused. More fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court. Its value to the defendant is not replaced by a system in which the prosecution presents its evidence via *ex parte* affidavits and waits for the defendant to subpoena the affiants if he chooses.

*Melendez-Diaz v. Massachusetts*, 557 U.S. at 324. The prosecution may, nonetheless, introduce the statement of a witness who is unavailable, even absent a prior opportunity for cross-examination by the defense, when: (1) when the statement is not "testimonial,"[10] *or* (2) when the

---

10 *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527 (2009).

witness is unavailable because the defendant engaged in wrongdoing designed to prevent the witness from testifying (forfeiture by wrongdoing).[11]

**Testimonial v. Non-Testimonial**

The out-of-court statement of a witness is *testimonial* when, "in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Ohio v. Clark*, 135 S. Ct. 2173, 2180, 192 L. Ed. 2d 306 (2015) (internal quotations and citations omitted). The class of testimonial statements covered by the Confrontation Clause includes:

> Various formulations of this core class of testimonial statements exist: ex parte in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[, as well as] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[.]

*Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 2273-2274 (2006).

*Non-testimonial* statements include those made about events "as they were actually happening," as opposed to "describing past events." *Davis* 547 U.S. at 827, 126 S.Ct. at 2276 (2006). Such non-testimonial statements are elicited to "*resolve* [a] present emergency, rather than to simply learn (as in *Crawford*) what happened in the past." *Id.* (emphasis in original). "[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Clark*, 135 S. Ct. at 2180 (quotations marks and internal citations omitted). For this reason, business records and public records are not subject to the Confrontation Clause:

---

[11] *Giles v. California*, 554 U.S. 353, 128 S.Ct. 2678 (2008); *see also* Fed. R. Ev. 804(b)(6).

> Business and public records are generally admissible absent confrontation not because
> they qualify under an exception to the hearsay rules, but because – having been
> created for the administration of an entity's affairs and not for the purpose of
> establishing or proving some fact at trial – they are not testimonial.

*Melendez-Diaz*, 557 U.S. at 324.  Given their extremely limited knowledge of the criminal justice

process, "[s]tatements by very young children will rarely, if ever, implicate the Confrontation

Clause."  *Clark*, 135 S. Ct. at 2182.

### Forfeiture by Wrongdoing

Finally, under Fed. R. Ev. 804(b)(6), a defendant forfeits his Sixth Amendment right to

confront witnesses against him if he "engaged or acquiesced in wrongdoing that was intended to,

and did, procure the unavailability of the declarant as a witness," then the defendant forfeits his

right to confront that witness.  Rule 804(b)(6) is simply the codification of the equitable doctrine

of forfeiture by wrongdoing.  *Davis v. Washington*, 547 U.S. 813, 833, 126 S.Ct. 2266, 165

L.Ed.2d 224 (2006).

### Harmless Error

Confrontation Clause violations are subject to harmless error analysis.  *Coy v. Iowa*, 487 U.S.

1012, 1021, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)).  In the context of harmless error analysis on

collateral review, "*habeas* petitioners . . . are not entitled to *habeas* relief based on trial error unless

they can establish that it resulted in 'actual prejudice.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113

S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citation omitted).  To make this decision, the court must

determine "whether the error had substantial and injurious effect or influence in determining the jury's

verdict."  *Id*.

### Application of the Confrontation Clause to the Present Petition

In the present case, B.J., the three-year-old victim, made statements to family members,

Department of Human Services ("DHS") employees, and various doctors and other professionals offering medical and psychiatric care. During these statements, B.J. identified her mother and the three defendants, Tim Jordan (her father), Glenn Grose, and Johnny Grose as those who sexually abused her. She made all of her statements outside of court; none were under oath, and none of the defendants ever had the chance to cross-examine her. With the aid of the professionals treating B.J., the prosecutor tried to interview her about the abuse; however, the mere mention of her parents' names caused an immediate decline in her mental health requiring her placement in a mental institution to recover. By any rational measure, B.J. was not available to testify, and she did not do so. Forfeiture by wrongdoing does not apply in the instant case because no one has argued that the defendants took action designed to prevent B.J. from testifying. Thus, the court must determine whether her statements are "testimonial" and thus within the purview of the Confrontation Clause. For the reasons set forth below, the court finds that the statements were not testimonial.

In a case involving the sexual abuse of a child, nearly all the child's communications with adults about the abuse have three purposes: (1) to protect the child from further abuse, (2) to treat the child, both medically and psychologically, and (3) to prepare a case for prosecuting the abuser. Only the third purpose triggers protection under the Confrontation Clause. It is possible for the child to reveal information regarding any of the three purposes at any time. However, especially during the time immediately following discovery of the abuse, it is imperative to identify any abusers to prevent further harm to the child. Authorities must ensure that the child is placed somewhere safe – away from the abusers. Medical and psychological examinations also occur immediately in order to treat the child. Might information gleaned from such treatment for physical and psychological trauma be used during prosecution? Of course. However, the treatment is necessary to the child's well-being,

and that was the focus of every medical professional involved with B.J. in this case. For example, during pretrial arguments regarding Mississippi's tender years doctrine, Robin Smith, a counselor treating B.J., testified that, if it were possible, she would ensure that B.J. *forgot* everything about the abuse and neglect (hardly a position consistent with aiding law enforcement and the prosecution). Smith said on cross-examination, "I'm hoping she has forgotten a lot of things. If you want to know the truth I don't want her to remember any of it." SCR, p. 594. Thus, she was focused solely on B.J.'s well-being, no matter the effect on the criminal case. There was no evidence that any medical professional treating B.J. focused primarily on prosecution, rather than treatment. Thus, none of B.J.'s disclosures to family members or medical providers was testimonial, and the Confrontation Clause does not apply to the disclosures.

**Forensic Interview: Harmless Error**

The forensic interview with B.J. requires a closer look, as it is more closely aligned with law enforcement goals than conversations with family members or medical providers. After all, "forensic" means, "relating to the use of scientific knowledge or methods in solving crimes."[12] To prove that an error at trial merits *habeas corpus* relief, the petitioner must show that "the error had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citation omitted). Trial error that does not rise to this level is harmless. *Id.* As set forth below, even if the state court's decision to admit the forensic interview recording into evidence were error, that error was harmless.

Despite its name, the forensic interview served, first and foremost, to protect the child. Authorities cannot protect a child from her abusers until they are identified. Very often an abuser is a

---

[12] http://www.merriam-webster.com/dictionary/forensic.

family member or close friend; as such, it is imperative to identify all abusers to prevent releasing the child into the waiting arms of the predator who hurt her in the first place. B.J. had identified four abusers before the forensic interview: Tim Jordan, Krystal Jordan, Glenn Grose, and Johnny Grose. However, it was not at all clear whether others had also abused her, and that information was crucial to B.J.'s safety. In addition, the recorded interview served to obviate the need to interview the small child repeatedly about the traumatic sexual assaults and long-term neglect she had suffered – providing yet another therapeutic benefit.

To prevent eliciting a false accusation from an impressionable child, forensic examiners are trained not to ask leading questions. In this case, however, the interviewer asked several leading questions regarding the identities of the abusers. In particular, early in the interview, B.J. had named Tim Jordan (her father), Krystal Jordan (her mother), and Johnny Grose – but not Glenn Grose – as her abusers. As the interviewer knew that Glenn Grose had been previously identified as an abuser, she asked, "Who is Glenn?" This was the first time anyone mentioned Glenn in the interview. SCR p. 433. Only after later questions regarding who had touched her vaginal area did B.J. name Glenn Grose. *Id.*, SCR p. 899.

The interviewer's decision to mention Glenn Grose before B.J. could have been problematic if it occurred in isolation. The State conceded that the interview was less than ideal, and every witness familiar with forensic interviews of children (including the State's witnesses) criticized that part of the interview. The court must, however, look at the evidence as a whole – not merely parts in isolation, and, when viewed as a whole, it shows that B.J. unambiguously identified Glenn Grose as one of her abusers. She did so without prompting, both before and after the interview, and to multiple people. Though she initially mentioned others who may have abused her, she was consistent over many

months in her statements that Krystal, Tim, Glenn, and Johnny did so. She also denied that her half-brother abused her; she did not simply accuse anyone around her at the time. Further, B.J. was not the only witness to name Glenn Grose as her abuser; Krystal Jordan also described his multiple violations of the three-year-old child in excruciating detail. This is not a case where the allegation is fondling, and there is no physical evidence that sexual contact occurred. Medical evidence and testimony about B.J.'s behavior conclusively established that she had been sexually abused "many, many times" over a period of months, leaving her physically, mentally, and emotionally damaged. SCR, p. 723.

In any event, to determine whether a witness' statement is testimonial, the court must focus primarily on the intent of the witness in giving the statement. *Ohio v. Clark*, 135 S. Ct. 2173, 2180, 192 L. Ed. 2d 306 (2015). A child of three or four has no concept of the workings of the criminal justice system; thus, she cannot form the intent to give statements in anticipation of the prosecution of the abuser. For this reason, "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause." *Id.* "Certainly, the statements in this case are nothing like the notorious use of *ex parte* examination in Sir Walter Raleigh's trial for treason, which [the Supreme Court has] frequently identified as 'the principal evil at which the Confrontation Clause was directed.'" *Ohio v. Clark*, 135 S. Ct. at 2182 (internal quotations and citations omitted).

As B.J. was a child of three years, and developmentally stunted from months or years of abuse and neglect, her statements to the forensic interviewer were not "testimonial" and thus do not trigger application of the Confrontation Clause. In addition, the child's disclosures both before and after the interview, as well as her mother's testimony, establish that Glenn Grose sexually abused B.J. Indeed, the testimony of the three defendants, themselves, bolstered Krystal

Jordan's credibility, as they agreed with the timeline and nearly every detail of her testimony regarding their interaction – except the sexual abuse, itself. As set forth above, Glenn and Tim even admitted having three-way sex with Krystal – *with the two children in the room* – and with Johnny present a short ways away near the front of the trailer. It certainly would not be a stretch for the jury to believe Krystal's version of events, as it also aligned with B.J.'s statements, medical reports, and psychological evaluations. Given this additional evidence supporting the charge, introduction of the forensic interview into evidence did not have a "substantial and injurious effect or influence in determining the jury's verdict" and, if it could be characterized as error at all, the error was harmless. *Brecht*, 507 U.S. at 637 (citation omitted). Glenn Grose cannot show the decision of the Mississippi Supreme Court to deny relief was contrary to clearly established federal law, or that it involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. The issue is without merit, and Grounds One and Two of the instant petition for a writ of *habeas corpus* will be denied.

### Ground Three: Introduction of Carnelia Fondren's Testimony

In Ground Three, Grose argues that the state court erred in permitting the prosecution to introduce the testimony of Carnelia Fondren, defense counsel for Krystal Jordan, to rebut defense counsel's argument that Mrs. Jordan pled guilty fraudulently to secure a lesser sentence. On direct appeal, the Mississippi Court of Appeals held:

> During Krystal's cross-examination, the defense showed that Krystal's testimony was the product of a plea agreement and implied that Krystal had motivation to fabricate this story against the defendants. Thus, the defense opened the door, allowing the State to present rebuttal evidence. *See Jackson v. State,* 766 So.2d 795, 808 (¶ 40) (Miss.Ct.App.2000). Fondren was allowed to testify about the particulars of Krystal's plea agreement and the disclosures Krystal had made to her about this case. Fondren testified that Krystal originally denied any involvement in the acts. However, as Fondren and Krystal established a relationship, Krystal finally admitted her guilt as to

the crimes charged against her. Thereafter, the State offered a recommended sentence in exchange for Krystal's cooperation in the defendants' cases. Because Krystal admitted to helping the defendants sexually abuse A.B., Fondren opined that Krystal was justified in entering a guilty plea to the charges. The supreme court has held that an accomplice's testimony that he or she had previously entered a guilty plea to the same charge that the defendant is being tried for is evidence of a prior consistent statement. *Hathorne v. State,* 759 So.2d 1127, 1132 (¶ 26) (Miss.1999). In addition, it is at times appropriate for a third person to testify to rebut a charge of improper influence or recent fabrication. *Williams v. State,* 749 So.2d 159, 164 (¶ 27) (Miss.Ct.App.1999) (*citing Hosford v. State*, 560 So.2d 163, 168 (Miss.1990)). Based on our review of the record and in light of Krystal's diminished mental capacity, we find that Fondren's testimony was a proper rebuttal to the defense's charge of recent fabrication, and it was not a bolstering of witness credibility. This issue is without merit.

*Grose v. State,* 80 So. 3d at 830.

The admissibility of evidence is a matter of state law. *Edwards v. Butler*, 882 F.2d 160, 164 (5th Cir. 1989). Federal *habeas corpus* relief is unavailable to correct errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991), *see also Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991). Federal *habeas corpus* relief is appropriate only when a conviction has been obtained in violation of federal law or a specific right protected by the United States Constitution. 28 U.S.C. § 2254(a); *Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). "When a federal court reviews state court evidentiary rulings on a petition for *habeas corpus*, it will grant relief only if the state court error is sufficiently egregious to render the entire trial fundamentally unfair." *Edwards*, 882 F.2d at 164. An erroneous state evidentiary ruling may be the basis for federal *habeas corpus* relief only if "the challenged evidence is a crucial, critical, or highly significant factor in the context of the entire trial." *Thomas v. Lynaugh*, 812 F.2d 225, 230 (5th Cir. 1987).

In the present case, the trial court's decision to admit the testimony of Carnelia Fondren was based upon state law, and it was appropriate, as the Mississippi Court of Appeals made clear. Defense

counsel opened the door for the testimony by arguing that Krystal Jordan obtained her favorable plea agreement through fraud; Ms. Fondren simply set forth the facts and rationale for negotiating and accepting the State's offer. Her testimony did not reveal additional facts about the charges; instead, the testimony merely rebutted the argument by the defense that there was no factual basis to support Krystal's plea agreement. In any event, these are matters of state law, and, as the evidence is not "a crucial, critical, or highly significant factor in the context of the entire trial," this court may not consider them on *habeas corpus* review. *Thomas* 812 F.2d at 230. The state court's decision to permit Fondren's testimony did not "render the entire trial fundamentally unfair," *Edwards*, 882 F.2d at 164, as the other evidence of Glenn Grose's guilt, outlined in the previous section, was more than sufficient to sustain his conviction. The petitioner has not shown that the decision of the Mississippi Supreme Court to deny relief was contrary to clearly established federal law, or that it involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. As such, this ground for relief is without merit and will be denied.

### Ground Five: Evidentiary Hearing Not Required

Under the Anti-Terrorism and Effective Death Penalty Act, ("AEDPA"), requests for an evidentiary hearing are evaluated under 28 U.S.C. § 2254(e)(2). *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000). When a *habeas* petitioner has failed to develop the factual basis of a claim, his path to an evidentiary hearing narrows to the exceptions of subsection (e)(2), which provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the application shows that–
>
> (A) the claim relies on–
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral r eview by the Supreme Court, that was previously unavailable; or

        (ii) a factual predicate that could not have been previously discovered through
        the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and
convincing evidence that but for the constitutional error, no reasonable factfinder
would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  These exceptions apply where the failure to develop the facts of claim is

solely the result of a decision or omission of the petitioner himself.  *Murphy*, 205 F.3d at 815.

Overcoming the restrictions in § 2254(e)(2) does not, however, guarantee a petitioner an evidentiary

hearing, it merely "opens the door for one;" the district court retains the discretion to grant or deny an

evidentiary hearing.  *Id.*  Further, a full and fair hearing does not necessarily require live testimony; a

"paper hearing" can be sufficient to afford a petitioner a full and fair opportunity to present factual

issues pertinent to his case.  *Id., see also Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996).  Finally,

where a district court has before it enough facts to make an informed decision regarding the merits of

a claim, the court does not abuse its discretion in refusing to grant an evidentiary hearing, even where

the state court made no explicit factual findings.  *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir.

1998).

        The court has reviewed the file and records of this case, has applied this analysis, and finds

that none of the petitioner's claims requires an evidentiary hearing.  The state court record contains all

the facts necessary to decide this case.  For this reason the petitioner's request for evidentiary hearing

will be denied.

### Additional Ground First Raised in the Traverse: The State Introduced Proof of Prior Convictions to Enhance Grose's Sentence in Violation of the Confrontation Clause

        Glenn Grose argues in his Traverse that the State violated the Confrontation Clause by

introducing evidence of his prior convictions through Lafayette County Sheriff Buddy East.  Grose

argues that Sheriff East did not have firsthand knowledge of the prior convictions and thus could not

be cross-examined regarding their authenticity, accuracy, and validity. Grose argues that this violates

the Supreme Court's holding in *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011): that a criminal

defendant has the right to confront scientific experts and technical analysts who prepare reports in

anticipation of a criminal trial. As an initial matter, the court notes that Mr. Grose raised this issue for

the first time in his Traverse; as such, it is not properly before the court. Nonetheless, the court will

address the issue briefly. Unlike the reports discussed in *Bullcoming*, proof of prior convictions is not

prepared in anticipation of a criminal proceeding; instead, it is an administrative public record. Such

records have always been admissible as an exception to the hearsay rule – and also because they are

not testimonial in nature:

> Business and public records are generally admissible absent confrontation not because
> they qualify under an exception to the hearsay rules, but because – having been
> created for the administration of an entity's affairs and not for the purpose of
> establishing or proving some fact at trial – they are not testimonial.

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324, 129 S. Ct. 2527, 2539–40, 174 L. Ed. 2d 314

(2009). This issue is also without merit and will be dismissed.

**Conclusion**

For the reasons set forth above, the instant petition for a writ of *habeas corpus* will be denied,

as will his request for an evidentiary hearing. A final judgment consistent with this memorandum

opinion will issue today.

**SO ORDERED**, this, the 19th day of September, 2016.

**/s/ MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**